## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BREAKWATER TRADING LLC, individually and on behalf of all those similarly situated, | |
| *Plaintiff*, | |
| v. | Civil Action No. 1:20-cv-3515 |
| JPMORGAN CHASE & CO., JP MORGAN CLEARING CORP., JP MORGAN SECURITIES LLC and JOHN DOES 1-25, | |
| *Defendants*. | CLASS ACTION COMPLAINT |
| | JURY TRIAL DEMANDED |

Plaintiff Breakwater Trading LLC files this civil action under Section 22 of the Commodity Exchange Act ("CEA"), Rule 23 of the Federal Rules of Civil Procedure, and common law for damages, costs of suit, and other relief as may be just and proper, each on behalf of itself and a class of those similarly situated ("Class" as defined below) against defendants JP Morgan Chase & Co., JP Morgan Clearing Corp., JP Morgan Securities LLC, JP Morgan Securities LLC, and John Does 1-25 (collectively, "Defendants") for Defendants' unlawful and intentional manipulation of U.S. Treasury futures contracts and options on those contracts ("Treasury Futures") that trade on United States-based exchanges. Based upon personal knowledge, information, belief, and investigation of counsel, Plaintiff specifically alleges:

**INTRODUCTION**

1.      Treasury Futures are standardized contracts for the purchase and sale of U.S. Government notes or bonds for future delivery.[1] These securities earn interest (known as coupon payments) through maturity when the "par" amount (equal to the principal) is returned to the owner.

2.      Defendants manipulated the prices of Treasury Futures by "spoofing," a practice the Commodity Futures Trading Commission ("CFTC") defines as "bidding or offering with the intent to cancel the bid or offer before execution," including "submitting or canceling bids or offers with intent to create artificial price movements upwards or downwards."[2] This practice artificially created demand, and the corresponding effect was that futures prices were artificially suppressed or inflated accordingly.[3]

3.      Throughout the Class Period defined below, Defendants routinely engaged in spoofing at the expense of Plaintiff and the Class, successfully manipulating the Treasury Futures trading market to benefit their own trading positions.

4.      Defendants disclosed that they are subject to a criminal investigation related to their misconduct. In its most recent Form 10-K, Defendant JP Morgan Chase & Co admitted that the Department of Justice's Criminal Division is investigating "trading-practice issues in markets…such as U.S. Treasuries."[4]

---

[1] CME Group, *The Basis of U.S. Treasury Futures*, https://www.cmegroup.com/trading/interest-rates/basics-of-us-treasury-futures.html (last visited May 5, 2020).

[2] Commodity Futures Trading Commission, Interpretive Guidance and Policy Statement on Disruptive Practices, *available at* https://www.cftc.gov/sites/default/files/idc/groups/public/@newsroom/documents/file/dtp_factsheet.pdf (last visited May 5, 2020).

[3] Matthew Leising, *Spoofing*, Bloomberg (Jan. 29, 2020), https://www.bloomberg.com/quicktake/spoofing (last accessed May 5, 2020).

[4] JPMorgan Chase & Co. 2019 Form 10-K, 280-281, (Feb. 25, 2020) available at: https://jpmorganchaseco.gcs-web.com/node/315401/html ( last accessed May 5, 2020).

5.      This is not Defendants' first brush with regulators regarding their spoofing practices. The Department of Justice is also "conducting investigations relating to trading practices in the metals market and related conduct." In 2018, the U.S. Department of Justice ("DOJ") criminally charged several of Defendants' employees, including Michael Nowak, head of their precious metals trading desk, for manipulating the prices of precious metals futures contracts. Two employees have already pled guilty.[5] Christian Trunz, a former trader that pled guilty with the DOJ in connection with his role in spoofing the metals market, revealed the pervasive nature of Defendants' spoofing. Trunz "learned to spoof from more senior traders, and spoofed with the knowledge and consent of his supervisors."[6] The Commodity Futures Trading Commission's Spoofing Task Force's settlement reflects this; the CFTC stated that Trunz engaged in spoofing on "thousands of occasions."[7]

6.      Plaintiff's allegations and claims are made on information and belief (except as to allegations specifically pertaining to Plaintiff, which are made with personal knowledge) based on the investigation conducted by and under the supervision of Plaintiff's counsel. That investigation included reviewing: (1) DOJ & CFTC enforcement proceedings and press releases, including documents made available through those proceedings, (2) publicly available reports, press releases, and articles regarding the Treasury market, (3) documents concerning

---

[5] See *United States v. Edmonds*, No. 3:18-cr-00239-RNC-1 (D. Conn. 2019); Order Instituting Proceedings Against John Edmonds Pursuant to Section 6(C) and (D) of the Commodity Exchange Act, Making Findings, And Imposing Remedial Sanctions, CFTC Docket No. 19-26, July 25, 2019; *United States v. Trunz*, No. 1:19-cr-00375 (E.D.N.Y. 2019); Order Instituting Proceedings Against Christian Trunz Pursuant to Section 6(C) and (D) of the Commodity Exchange Act, Making Findings, And Imposing Remedial Sanctions, CFTC Docket No. 19-26, September 16, 2019.

[6] Press Release, Department of Justice, Precious Metals Trader Pleads Guilty to Conspiracy and Spoofing Charges (August 20, 2019).

[7] Press Release, Commodity Futures Trading Commission, In CFTC Action, Former Precious Metal Trader Admits to Engaging in Spoofing at Two New York Banks (Sept. 16, 2019).

Defendants' business practices made public through private civil litigation, and (4) Defendants'

U.S. Securities and Exchange Commission ("SEC") Filings.

7.      Defendants' misconduct was inherently self-concealing. After reasonable

discovery, Plaintiff will uncover more evidence to support the allegations contained herein.

**JURISDICTION AND VENUE**

8.      This Court has jurisdiction over this action pursuant to Section 22 of the CEA, 7

U.S.C. § 25, and 28 U.S.C. §§ 1331 and 1337.

9.      Venue is proper in this District, pursuant to 28 U.S.C. § 1391(b), (c), and (d)

Section 22 of the CEA, 7 U.S.C. § 25(c). During the Class Period, each Defendant resided,

transacted business, was found, or had agents in the District; a substantial portion of the events or

omissions giving rise to Plaintiff's claims occurred in this District; and a substantial portion of

the affected interstate trade and commerce discussed herein has been carried out in this District,

as more particularly alleged below. Defendants are headquartered in this District.

10.     This Court has personal jurisdiction over each Defendant. As alleged below, a

substantial part of the events giving rise to Plaintiff's claims occurred in this District and the

United States. Defendants manipulated the prices of Treasury Futures that Defendants traded in

this District and with customers located in the United States. Defendants' manipulation harmed

investors in this District and throughout the United States by causing them to pay more for their

Treasury Futures purchases and receive less for their Treasury Futures sales than they would

have in an unmanipulated market.

11.     Defendants, either themselves or through their subsidiaries as agents, purposefully

availed themselves of doing business in the United States and in this District by, *inter alia*: (a)

manipulating the prices of Treasury Futures in transactions with investors in this District and

throughout the United States; and (b) collecting unlawful overcharges from, and paying unlawful prices to investors in this District and throughout the United States.

**PARTIES**

### I.    Plaintiff

12.     Plaintiff Breakwater Trading LLC ("Breakwater") is organized as a limited liability company under Delaware law, and headquartered in Chicago, Illinois. During certain portions of the Class Period, Breakwater was a top 15 liquidity provider for Treasuries. Breakwater's Treasuries transactions included both spot and futures trading which averaged, on a daily basis, over $4 billion in notional value. In other words, Breakwater's Treasuries and Treasury-Predicated Instrument (as defined below) trading at that point amounted to over $1 trillion per year in notional value.

### II.    Defendants

13.     Defendant JP Morgan Securities LLC ("JPMorgan") is a Delaware corporation with its principal place of business in New York, New York. From its New York City address, JPMorgan presides over 111 subsidiaries and 888 individual branches spread throughout the world.

14.      JPMorgan operates as a subsidiary of JP Morgan Chase & Co. During the Class Period, JPMorgan, including its predecessors, served as a primary dealer of U.S. Treasury securities and transacted in U.S. Treasury- based instruments, including Treasury Futures.

15.     Defendant JP Morgan Chase & Co. ("JPMC") is a Delaware corporation headquartered in New York, New York. JPMC is a multinational banking and financial services corporation. JPMC has approximately 37,000 employees in the New York City metro area, more than any other single locale in the world.

16.     Defendant JP Morgan Clearing Corp. is a Delaware corporation headquartered in New York, New York. JP Morgan Clearing Corp. offers securities and futures clearing, settlement, lending, and related services to traders, hedge fund managers, broker- dealers, and investment advisors. It also provides operational and administrative services for registered broker-dealers.

17.     Defendants John Doe 1-25 are persons and entities employed by or affiliated with Defendants or others that directly or indirectly improperly or unlawfully influenced or attempted to influence the trading and prices of Treasury Futures. The term "Defendants" also includes the John Doe Defendants.

18.     During the Class Period, Defendants' subsidiaries or other affiliates of Defendants participated in and furthered the manipulation of Treasury Futures, at artificial prices not based on accurate supply and demand of these instruments, to Defendants' direct benefit and the ultimate detriment of Plaintiff and the Class as alleged herein.

19.     The wrongful acts alleged to have been conducted by any one Defendant were authorized, ordered, or done by its directors, officers, managers, agents, employees, or representatives while actively engaged in the management, direction, or control of such Defendant's affairs.

20.     Each of the Defendants acted as the agent of, or participated in a joint venture for, the other Defendants concerning the acts, violations and common course of conduct alleged herein.

**FACTUAL ALLEGATIONS**

**I.   Overview of Treasury Futures**

21.     Marketable U.S. Treasury bills, notes, bonds and certain related instruments are commonly referenced as "Treasuries." The Treasuries market is the world's most liquid

government securities market. It is the primary means by which the U.S. government finances itself and manages its debt load. Treasury bonds and notes represent loans to the U.S. government. Bondholders are creditors rather than equity- or share-holders. The U.S. government agrees to repay the face (or principal or par) amount of treasury bonds or notes at maturity, plus the coupon at semi-annual intervals. Treasuries are often considered "riskless" investments given that the "full faith and credit" of the U.S. government backs these securities. The Treasury buyer can either (i) hold the Bond or Note until maturity, at which time the face value becomes due, or (ii) re-sell the Bond or Note in the secondary market prior to maturity. In the latter case, the investor recovers the market value of the bond or note, which may be more or less than its face value, depending upon prevailing yields. In the meantime, the investor receives semi-annual coupon payments every six months. Auctions and derivative financial products, including exchange-traded futures and options, are referenced herein as "Treasury-Predicated Instruments."

      22.     Treasury Futures are standardized contracts for the purchase and sale of U.S. Government notes or bonds for future delivery. They are highly liquid, and thus provide easy access to leverage and both capital and operational efficiencies. Furthermore, they are a neutral security—they can be traded on both the long or short side, allowing a trader to hedge risk and exposures. These properties make them an attractive investment proposition for a broad mix of customers, such as asset managers, banks, hedge funds, and insurance companies.[8]

      23.     U.S. Treasury futures and option contracts are available for each of the Treasury benchmark tenors: 2-year, 5-year, 10-year, and 30-year tenors. In addition, the Chicago

---

[8] CME Group, *The Basics of U.S. Treasury Futures*, https://www.cmegroup.com/trading/interest-rates/basics-of-us-treasury-futures.html (last accessed May 5, 2020).

Mercantile Exchange ("CME") also offers Ultra 10- year T-Note Futures and Ultra US Treasury Bond Futures.[9] According to the CME, in February 2020, the average daily volume was 4.4 million Treasury Futures contracts and nearly 1 million Treasury Options contracts.

24.     The inherent nature of the Treasuries Futures market makes them susceptible to spoofing. "Spoofing," as defined by the CFTC, includes: (a) submitting or cancelling bids or offers to overload the quotations system of a registered entity, (b) submitting or cancelling bids or offers to delay another person's execution of trades, (c) submitting or cancelling multiple bids or offers to create an appearance of false market depth, or (d) submitting or canceling bids or offers with the intent to create artificial price movements upwards or downwards.[10]

25.      Spoofing is a prohibited practice that undermines the integrity of trading. It creates fake demand that pushes prices up or down. It has "emerged in an era of computerized trading as a threat to market legitimacy."[11]

26.     As illustrated in the figure below, Spoofing occurs in three phases, the "build up," the "cancel," and the "sweep."[12] In this example, in the "build up," the spoofer makes offers to sell—offers the spoofer does not intend to honor. Honest traders follow this trend, and enter their own sell orders. This creates artificial volatility that does not represent market reality. With an influx of sell orders entering the market, honest traders expect that the contract price will crash, and so the honest traders think that they will be able to buy back their contracts for a profit. In phase two, the spoofer "cancels" the fake order. This has the effect of removing the spoofer's

---

[9] *Id.*

[10] CFTC, Antidisruptive Practices Authority, Interpretive Guidance and Policy Statement, 78 Fed. Reg. 31890, 31896 (May 28, 2013).

[11] Matthew Leising, *Spoofing*, Bloomberg (Jan. 29, 2020), https://www.bloomberg.com/quicktake/spoofing (last accessed May 5, 2020).

[12] Matthew Leising, Mira Rojanasakul, & Adam Pierce, *How to Catch a Spoofer,* Bloomberg (Sept. 4, 2015) https://www.bloomberg.com/graphics/2015-spoofing/ (last accessed May 5, 2020).

artificial demand from the order book. The spoofer then completes the "sweep." The spoofer puts in a large buy order, sweeping up the market. At this point, the honest traders are trying to reverse their trades and repurchase the contracts, while the spoofer is waiting to sell the contracts back—at a significant profit.



27.     Spoofing can be done in either direction. In each instance, the trader profits. Spoofing allows the trader to buy futures contracts at below the current market price, or to sell futures contracts at above the current market price. The CFTC has described spoofing as "a particularly pernicious example of bad actors seeking to manipulate the market through the abuse

of technology."[13] While the electronic order book has increased information available to traders, "it create[d] the possibility that false information injected into the order book could trick [honest traders] into trading to benefit a bad actor." [14]

28.     Defendants' spoofing exploited honest traders such as Plaintiff and Class members who purchased or sold Treasury Futures at artificial prices during the Class Period. Defendants' use of spoofing undermined the integrity of the market for Treasury Futures.

## II.  Defendants' Misconduct

### A.  Defendants Manipulated the Treasury Futures Market.

29.     Throughout the Class Period, Defendants perpetrated a sophisticated manipulative scheme in which they injected materially false and illegitimate signals of supply and demand into the Treasury Futures market in order to (a) induce other market participants to trade against Defendants' genuine orders (*i.e.*, orders that Defendants did want to execute) on the opposite side of the market from the spoof orders at prices, quantities, and times at which Plaintiff and other market participants otherwise would not have traded, and (b) financially benefit Defendants.

30.     Defendants routinely placed electronic orders to buy and sell Treasury Futures with the intent to cancel those orders before execution to make profits and avoid losses.

31.     Defendants' spoofing had effects in markets above and beyond those for Treasury Futures and options on those futures, as both algorithmic traders and others consider prices for Treasury Futures in assessing other investment products.

---

[13] See Press Release, CFTC, Statement of CFTC Director of Enforcement James McDonald (January 29, 2018), available at: https://www.cftc.gov/PressRoom/SpeechesTestimony/mcdonaldstatement012918 (last accessed May 5, 2020).

[14] See Press Release, CFTC, Statement of CFTC Director of Enforcement James McDonald (Nov. 14, 2018), available at: https://www.cftc.gov/PressRoom/SpeechesTestimony/mcdonaldstatement012918 (last accessed May 5, 2020).

32.    Defendants' misconduct was unknown to investors until JPMorgan disclosed it in its 2019 Form 10-K, which it filed on February 25, 2020:

> *Metals and U.S. Treasuries Investigations and Litigation and Related Inquiries.*
> Various authorities, including the Department of Justice's Criminal Division, are conducting investigations relating to trading practices in the metals markets and related conduct. The Firm also is responding to related requests concerning similar trading-practices issues in markets for other financial instruments, such as U.S. Treasuries.[15]

33.    On March 17, 2020, the Wall Street Journal reported that Defendants are being probed for manipulation of Treasury securities *and* future contracts.[16] As the article put it, "[a]ccording to people familiar with the matter, the investigation also is probing the bank's trading in futures"—in addition to other Treasuries instruments.[17] Officials in the "Justice Department's Fraud Section and regulators at the Commodity Futures Trading Commission are involved" in the investigation.[18]

**B.  Defendants Manipulated Other Markets.**

34.    Over the last ten years, JPMorgan has repeatedly engaged in trading practices that violate federal law and trigger civil and criminal sanction. Defendant JP Morgan Chase, for example, is currently a defendant in a related action alleging manipulation of NYMEX platinum futures contracts, NYMEX palladium futures contracts, COMEX silver futures contracts, COMEX gold futures contracts, and options on those futures contracts, in violation of the CEA,

---

[15] JPMorgan Chase & Co., 2019 Form 10-K (Feb. 25, 2020), at 28, available at: https://www.sec.gov/ix?doc= /Archives/edgar/data/19617/000001961720000257/corp10k2019.htm (last accessed May 5, 2020).

[16] Dave Michaels, "Government is Broadening Investigations of Spoofing-Like Practices," Wall Street Journal, (Mar. 17, 2020) available at: https://www.wsj.com/articles/government-is-broadening- investigations-of-spoofing-like-practices-11584446400 (last accessed May 5, 2020).

[17] *Id.*

[18] Global Investigations Review, "DOJ Expands JPMorgan Spoofing Probe," (Mar. 17, 2020) available at: https://globalinvestigationsreview.com/short-cut/2020/march/17 (last accessed May 5, 2020).

7 U.S.C. § 1, *et seq.*, through their spoofing, as here, and use of fictitious buy and sell orders and other manipulative conduct.[19]

35.     Additionally, in 2013, J.P. Morgan agreed to pay U.S. federal energy regulators $410 million in connection with "power" market manipulation claims in 2013.[20] The company has also previously agreed to pay a criminal fine of $550 million in connection with a Plea Agreement in May 2015 related to market-rigging of the FX spot market.[21]

36.     Federal regulators in recent years have also pursued fines and criminal sanctions against Defendants and their employees for similar spoofing and other manipulation of the futures markets. Bloomberg encapsulated the government's allegations appropriately with the headline, "JPMorgan's Metals Desk Was a Criminal Enterprise, U.S. Says."[22] The findings and disciplinary record demonstrate that Defendants artfully honed their use of spoofing to manipulate the market for the express purpose of increasing their profitability at the expense of other investors.

37.     Furthermore, the DOJ and CFTC have already charged several of Defendants' employees with manipulating the precious metal futures market including Michael Nowak, Gregg Smith, and Christopher Jordan, who have been charged under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Their crime spree of manipulation and spoofing – placing orders and then canceling them to trick other market participants – spanned nearly a

---

[19] *See* .

[20] See Scott DiSavino, "JPMorgan to pay $410 million to settle power market case," Reuters (July 30, 2013), *available at*: https://www.reuters.com/article/us-jpmorgan-ferc/jpmorgan-to-pay-410-million- to-settle-power-market-case-idUSBRE96T0NA20130730 (last accessed May 5, 2020).

[21] *See U.S. v. JP Morgan Chase & Co.* (D. Conn. 2015), Plea Agreement, dated May 19, 2015, *available at*: https://www.justice.gov/file/440491/download (last accessed May 5, 2020).

[22] *See, e.g.,* Tom Schoenberg and David Voreacos, "JPMorgan's Metals Desk was a Criminal Enterprise, U.S. Says," *Bloomberg* (Sept. 16, 2019), *available at*: https://www.bloomberg.com/news/articles/2019- 09-16/jpmorgan-s-metals-desk-was-a-criminal-enterprise-u-s-says (last accessed May 5, 2020).

decade. According to the Department of Justice, more than a dozen individuals participated in the scheme.[23] So far, two have pled guilty to commodities fraud and a spoofing conspiracy for their participation in fraudulent and deceptive trading activity in the precious metal futures markets.[24] Others have also settled related civil claims with the CFTC.

38.     One of those pleading guilty was Christian Trunz, a former metals trader. On August 29, 2019, Trunz pled guilty to "one count of conspiracy to engage in spoofing and one count of spoofing." In his plea allocution, Trunz admitted that between July 2007 and August 2016 he placed thousands of orders that he did not intend to execute for gold, silver, platinum, and palladium futures contracts traded on CME Group-operated exchanges. "Trunz learned to spoof from more senior traders, and spoofed with the knowledge and consent of his supervisors and is cooperating with authorities."[25]

39.     John Edmonds, another trader, also pled guilty in the spoofing conspiracy. On November 6, 2018, in announcing the guilty plea, the DOJ stated that:

> For years, John Edmonds engaged in a sophisticated scheme to manipulate the market for precious metals futures contracts for his own gain by placing orders that were never intended to be executed. . . . The Criminal Division is committed to prosecuting those who undermine the investing public's trust in the integrity of our commodities markets through spoofing or any other illegal conduct. . . . In pleading guilty, Edmonds admitted that he learned this deceptive trading strategy from more senior traders at the Bank, and he personally deployed this strategy hundreds of times with the knowledge and consent of his immediate supervisors. This case is the result of an ongoing investigation by the FBI's New York Field Office.[26]

---

[23] See n.12, *supra*.

[24] Press Release, DOJ, "Former Precious Metals Trader Pleads Guilty to Commodities Fraud and Spoofing Conspiracy" (Nov. 6, 2018) *available at*: https://www.justice.gov/opa/pr/former-precious- metals-trader-pleads-guilty-commodities-fraud-and-spoofing-conspiracy (last accessed May 5, 2020).

[25] Press Release, DOJ, "Precious Metals Trader Pleads Guilty to Conspiracy and Spoofing Charges," (Aug. 20, 2019) *available at*: https://www.justice.gov/opa/pr/precious-metals-trader-pleads-guilty- conspiracy-and-spoofing-charges ( last accessed May 5, 2020).

[26] *Id.*

(emphasis added).

40.    The pervasiveness and longevity of Defendants' market rigging practices among their employees are startling: that Edmonds' and Trunz's "immediate supervisors" taught traders at J.P. Morgan how to spoof and were involved in the market rigging indicates that Defendants cultivated a trading culture rooted in the ever-changing use of deceit. Indeed, federal prosecutors have stated that more than a dozen of Defendants' employees ultimately helped execute manipulative spoof trades.[27] Prosecutors also highlighted that J.P. Morgan employed an advanced method of spoofing – namely, J.P. Morgan traders layered multiple Deceptive Orders at different prices in rapid succession that, in the aggregate if not individually, were substantially larger than the visible portion of the opposite-side Genuine Order. This new style of "layering" was more difficult both to execute and to detect.[28]

41.    Federal regulators have paid increasing attention to Defendants' ever-changing market manipulation schemes and continue to target their employees. For example, on November 15, 2019, the DOJ charged four of Defendants' senior employees, including those supervising Trunz and Edmonds and other traders on the precious metals desk: Jeffrey Ruffo (executive director who specialized in hedge fund sales); Gregg Smith (managing director of the trading desk); Michael Nowak (managing director and head of the precious metals desk); and Christopher Jordan (executive director and metals trader). The charges against them include: one count of conspiracy to conduct the affairs of an enterprise involved in interstate or foreign commerce through a pattern of racketeering activity (i.e., a "RICO" conspiracy); one count of

---

[27] *See* n.12, *supra*.

[28] Superseding Indictment, *United States v. Gregg Smith, Michael Nowak, Jeffrey Ruffo, and Christopher Jordan*, No. 19 CR 669 (EEC) (N.D. Ill. No. 14, 2019), ECF No. 52 at ¶ 26e.

conspiracy to commit wire fraud affecting a financial institution; bank fraud; commodities fraud;

price manipulation; and spoofing.

42.     Specifically, the 14-count indictment alleges, inter alia, that:

The Defendants and their co-conspirators placed orders to buy and sell precious
metals futures contracts with the intent to cancel those orders before execution,
including in an attempt to artificially affect prices and to profit by deceiving other
market participants. More specifically:

a.     In thousands of trading sequences, the Defendants and their
coconspirators placed one or more orders for precious metals futures contracts
that they intended to execute ("Genuine Orders"). Sometimes, but not always,
the Genuine Orders were iceberg orders, so that other market participants
could see only a portion of the order's full size at any given time.

b.     During the same trading sequences, the Defendants and their
coconspirators also placed one or more orders that they intended to cancel
before execution ("Deceptive Orders") on the opposite side of the market
from the Genuine Orders. The Deceptive Orders were not iceberg orders, and
so the full order size was visible to other market participants.

43.     The indictment further alleges that, through placing Deceptive Orders,

Defendants' employees sought to insert false and misleading information about the actual supply

and demand for precious metals futures contracts, and to deceive other market participants into

believing that the visible order book accurately reflected market-based forces of supply and

demand. As a result, "[t]his false and misleading information was intended to, and at times did,

trick other market participants into reacting to the apparent change and imbalance in supply and

demand by buying and selling precious metals futures contracts at quantities, prices, and times

that they otherwise likely would not have traded."[29]

---

[29] Press Release, DOJ, "Superseding Indictment Charges Former Precious Metals Salesman with

Racketeering Conspiracy," (Nov. 15, 2019) available at: https://www.justice.gov/opa/pr/superseding- indictment-
charges-former-precious-metals-salesman-racketeering-conspiracy ( last accessed May 5, 2020).

## CLASS ACTION ALLEGATIONS

44.     Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil

Procedure on its own behalf and as representatives of the following Class[30]:

> All persons or entities who transacted in Treasury Futures or options on Treasury
> Futures traded on a United States exchange during the period January 1, 2009
> through the present (the "Class Period"), where such persons or entities were
> domiciled in the United States or its territories. Excluded from the Class are the
> Defendants and any parent, subsidiary, affiliate, employee, agent or co-
> conspirator of any Defendant.

45.     The Class is so numerous that the individual joinder of all members is

impracticable. While the exact number of Class members is unknown at this time, Plaintiff is

informed and believes that at least thousands of geographically dispersed Class members

transacted in Treasury Futures and options on Treasury Futures during the Class Period at

artificial prices due to Defendants' manipulation.

46.     Plaintiff's claims are typical of the claims of the other members of the Class.

Plaintiff and the Class sustained damages arising out of Defendants' common course of conduct

in violation of law as complained of herein. The injuries and damages of each member of the

Class were directly caused by Defendants' wrongful conduct in violation of the laws as alleged

herein.

47.     Plaintiff will fairly and adequately protect the interests of the members of the

Class. Plaintiff is an adequate representative of the Class and has no interests that are adverse to

the interests of the Class.

48.     Plaintiff has retained counsel competent and experienced in class action litigation,

including CEA class action litigation concerning manipulation of financial markets.

---

[30] The class definition is based on currently available information and Plaintiff reserves the right to amend the
definition of the Class, including, without limitation, the Class Period.

49.    Common questions of law and fact exist as to all members of the Class, which predominate over any questions affecting solely individual members of the Class. These common questions of law and facts include, without limitation:

      a.   whether Defendants' manipulation caused the prices for Treasury Futures and options on Treasury Futures to be artificial during the Class Period;

      b.   whether Defendants' unlawful acts violate Section 22 of the Commodity Exchange Act;

      c.   whether Defendants' unlawful conduct caused injury to the business or property of Plaintiff and the Class;

      d.   the operative time period and extent of Defendants' foregoing violations; and

      e.   whether such injury or the fact or extent of artificiality in Treasury Futures prices caused by Defendants' conduct may be established by common, class-wide means, including, for example, by regression analysis, econometric formula, or other economic tests.

50.    A class action is superior to other methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many class members who could not afford individually to litigate claims such as those asserted in this Complaint. The cost to the court system of adjudication of such individualized litigation would be substantial. The prosecution of separate actions by

individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

51.     Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

**EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT**

52.     The statutes of limitations governing Plaintiff's claims were tolled under the doctrine of fraudulent concealment until at least February 25, 2020, when Defendants announced in their 2019 Form 10-K filing with the SEC that they had received a request from regulators regarding their practices in the Treasury Futures market. The doctrine applies here because Defendants fraudulently concealed their misconduct through their own affirmative acts, and because Defendants' conduct was inherently self-concealing.

53.     Defendants actively concealed their violations of law from Plaintiff and the Class by, *inter alia*: (i) relying on non-public forms of communication, such as private electronic messages and telephone calls; (ii) implicitly representing that the pricing quotes Defendants supplied to Plaintiff and the Class were the product of honest trading and not fixed by manipulation; and (iii) affirmatively misrepresenting that they complied with applicable laws and regulations.

54.     In particular, JPMorgan Chase & Co. published a "Code of Conduct" during the Class Period that applied to "all its direct and indirect subsidiaries." In the Code of Conduct, JPMorgan Chase & Co. claimed that it was "committed to complying with the letter and spirit of applicable competition laws wherever we do business." JPMorgan Chase & Co. reported in its 2010 Annual Report that its Audit Committee "reviews with management the system of internal controls that is relied upon to provide reasonable assurance of compliance with the Firm's operational risk management processes." It further assured investors that it "has established

18

policies and procedures, and has in place various oversight functions, intended to promote the Firm's culture of 'doing the right thing.'"

55.     Defendants' manipulation was inherently self-concealing because it relied on secrecy for its successful operation. Had the public learned that Defendants manipulated prices in the Treasury Futures market, their manipulation could not have continued for as long as it did.

56.     Because of Defendants' fraudulent concealment, Plaintiff and the Class were not aware of Defendants' misconduct and could not have discovered it through the exercise of due diligence until February 25, 2020. Accordingly, Plaintiff asserts that the applicable statutes of limitations on Plaintiff's claims were tolled. Defendants are also equitably estopped from asserting any statute of limitations defense.

### FIRST CLAIM FOR RELIEF

### Manipulation in Violation of the Commodity Exchange Act
### 7 U.S.C. § 1, *et seq.*

57.     Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

58.     Defendants through their acts alleged herein specifically intended to and did cause unlawful and artificial prices of Treasury Futures, and options on those futures, in violation of the CEA, 7 U.S.C. § 1, *et seq.*, through their use of fictitious buy and sell orders and other manipulative conduct.

59.     Defendants manipulated the price of a commodity in interstate commerce or for future delivery on or subject to the rules of any registered entity, in violation of the CEA.

60.     During the Class Period, the prices of Treasury Futures, and options on those futures, did not result from the legitimate market information and the forces of supply and

demand. Instead, the prices of Treasury Futures, and options on those futures, were artificially inflated, or deflated, by Defendants' spoofing and other manipulative trading activities.

61.     Throughout the Class Period, Defendants entered large orders to buy or sell without the intention of having those orders filled, and specifically intending to cancel those orders prior to execution. Defendants did this with the intent to inject illegitimate information about supply and demand into the marketplace, and to artificially move prices up or down to suit Defendants' own trades and positions. As a result of these artificial prices, Plaintiff and the Class suffered losses on their trades in Treasury Futures and options on those futures.

62.     Through their use of spoofing and other manipulative techniques, Defendants manipulated the prices of Treasury Futures and options on those futures, throughout the Class Period and thereby caused damages to Plaintiff and Class members who purchased or sold such instruments at artificially inflated or deflated prices.

63.     At all times and in all circumstances previously alleged herein, Defendants had the ability to cause and did cause artificial prices of Treasury Futures and options on those futures. Defendants, either directly and/or through their employees and/or affiliates, were active in the markets for Treasury Futures and options on those futures, and were aware of the effects of spoofing and other manipulative conduct on those markets.

64.     By their intentional misconduct, Defendants each violated Sections 6(c), 6(d), 9(a), and 22(a) of the CEA, 7 U.S.C. §§ 9, 13b, 13(a), and 25(a), throughout the Class Period.

65.     As a result of Defendants' unlawful conduct, Plaintiff and members of the Class have suffered damages and injury-in-fact due to artificial prices for Treasury Futures and options on those futures, to which Plaintiff and the Class would not have been subject but for the unlawful conduct of the Defendants as alleged herein.

66.     Plaintiff and members of the Class are entitled to actual damages sustained in Treasury Futures and options on those futures for the violations of the CEA alleged herein.

### SECOND CLAIM FOR RELIEF

**Employing a Manipulative and Deceptive Device In
Violation of the Commodity Exchange Act
7 U.S.C. §§ 1, *et seq.* and Regulation 180.1(a)**

67.     Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

68.     Defendants' unlawful conduct as described herein, including the use of systematically submitting and cancelling spoof orders and engaging in other manipulative conduct in order to artificially move prices for Treasury Futures and options on those futures constitutes the employment of a manipulative and deceptive device.

69.     As alleged herein, Defendants acted intentionally—and, even if they are found to not have acted intentionally, then at least acted recklessly—in employing the manipulative and deceptive device to procure ill-gotten trading profits at the expense of Plaintiff and the Class.

70.     By their intentional misconduct, Defendants each violated Sections 6(c) and 22(a) of the CEA, 7 U.S.C. §§ 9 and 25(a), throughout the Class Period.

71.     As a result of Defendants' unlawful conduct, Plaintiff and members of the Class have suffered damages and injury-in-fact due to artificial prices for Treasury Futures and options on those futures, to which Plaintiff and the Class would not have been subject but for the unlawful conduct of the Defendants as alleged herein.

72.     Plaintiff and members of the Class are entitled to damages for the violations of the CEA alleged herein.

## THIRD CLAIM FOR RELIEF

### Principal-Agent Liability for Violation of the
### Commodity Exchange Act
### 7 U.S.C. §§ 1, *et seq.*

73.     Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

74.     Each Defendant is liable under Section 2(a)(1) of the CEA, 7 U.S.C. § 2(a)(1), for the manipulative acts of their agents, representatives, and/or other persons acting for them in the scope of their employment.

75.     Plaintiff and members of the Class are entitled to damages for the violation alleged herein.

## FOURTH CLAIM FOR RELIEF

### Unjust Enrichment

76.     Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

77.     Defendants benefited financially from their unlawful acts. As alleged herein, Defendants submitted spoof orders electronically and employed other manipulative techniques to manipulate the prices of Treasury Futures and options on those futures in an artificial direction. Defendants intended to, and did, artificially alter prices in a direction that benefitted their trades and positions, at the expense of Plaintiff and the Class.

78.     These unlawful acts caused Plaintiff and other members of the Class to suffer injury, lose money, and transact at artificial prices for Treasury Futures and options on those futures.

79.     As a result of the foregoing, it is unjust and inequitable for Defendants to have enriched themselves in this manner at the expense of Plaintiff and members of the Class, and the circumstances are such that equity and good conscience require Defendants to make restitution.

80.     Each Defendant should pay restitution for its own unjust enrichment to Plaintiff and members of the Class.

## PRAYER FOR RELIEF

Accordingly, Plaintiff demands relief as follows:

A.     For an order certifying this lawsuit as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, designating Plaintiff as the Class representative, and appointing their counsel as Class counsel;

B.     For the unlawful conduct alleged herein to be adjudged and decreed to be an unlawful restraint of trade in violation of Section 22 of the Commodity Exchange Act;

C.     For Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from continuing and maintaining the manipulation alleged in the Complaint;

D.     For a judgment awarding Plaintiff and the Class damages against Defendants for Defendants' violations of the federal antitrust laws, in an amount to be trebled in accordance with such laws;

E.     For an award to Plaintiff and the Class of their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

F.     For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues.

Dated: May 5, 2020

Respectfully submitted,

**NUSSBAUM LAW GROUP, P.C.**

By:_____*s/ Linda P. Nussbaum*_____
Linda P. Nussbaum
Bart D. Cohen
Christopher B. Sanchez
Marc E. Foto
1211 Avenue of the Americas, 40th Fl.
New York, NY 10036
(917) 438-9189
lnussbaum@nussbaumpc.com
bcohen@nussbaumpc.com
csanchez@nussbaumpc.com
mfoto@nussbaumpc.com

Michael E. Criden
Kevin B. Love
Lindsey C. Grossman
CRIDEN & LOVE, P.A.
7301 S.W. 57th Court, Suite 515
South Miami, FL 33143
(305) 357-9000
mcriden@cridenlove.com
klove@cridenlove.com
lgrossman@cridenlove.com

*Counsel for Plaintiff and the Proposed Class*