**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE JPMORGAN TREASURY SPOOFING LITIGATION | Case No. 20 Civ. 3515 (PAE)<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

NATURE OF THE ACTION ........................................................................................... 1

JURISDICTION AND VENUE ...................................................................................... 5

THE PARTIES ................................................................................................................ 6

    I.       Plaintiffs .................................................................................................... 6

    II.     Defendants ................................................................................................ 9

        A.     JPMorgan Chase & Co. ................................................................. 9

        B.     J.P. Morgan Securities LLC ........................................................... 9

        C.     J.P. Morgan Clearing Corp. .......................................................... 9

        D.    J.P. Morgan Futures, Inc. ............................................................ 10

        E.     John Doe Defendants .................................................................. 10

FACTUAL ALLEGATIONS ......................................................................................... 11

    I.       Relevant Factual Background .................................................................. 11

        A.     Overview of Treasury Securities .................................................. 11

        B.     Overview of Treasury Futures ..................................................... 12

              1.     Overview of Key Terms .................................................. 12

              2.     The CME Group .............................................................. 14

        C.     The Mechanics of Spoofing ......................................................... 17

    II.     Evidence of Defendants' Misconduct ..................................................... 21

        A.     Overview of Government Settlements .......................................... 21

        B.     JPMorgan is an Active Participant in the U.S. Treasuries Market .............................. 24

        C.     Defendants' Manipulation of Treasury Futures ........................... 26

              1.     July 20, 2009 – T-Bond Futures ..................................... 27

              2.     December 9, 2009 – T-Bond Futures .............................. 28

              3.     February 4, 2010 – 10-Year T-Note Futures .................. 29

4.      June 3, 2010 – T-Bond Futures ....................................................29

5.      July 20, 2010 – 10-Year T-Note Futures.....................................30

6.      January 26, 2011 – 10-Year T-Note Futures ..............................31

7.      June 28, 2011 – 10-Year T-Note Futures ...................................32

8.      September 27, 2011 – 10-Year T-Note Futures..........................32

9.      October 4, 2011 – 10-Year T-Note Futures ...............................33

10.     January 25, 2012 – 10-Year T-Note Futures ..............................34

11.     March 16, 2012 – 5-Year T-Note Futures ..................................35

12.     April 2, 2012 – Ultra T-Bond Futures Contract.........................36

13.     February 13, 2013 – T-Bond Futures Contract..........................36

14.     June 19, 2013 – T-Bond Futures Contract .................................37

15.     June 30, 2015 – Ultra T-Bond Futures Contract........................38

16.     December 3, 2015 – Ultra T-Bond Futures Contract..................39

17.     January 6, 2016 – T-Bond Futures Contract ..............................39

D.      Defendants Failed to Supervise its U.S. Treasuries Desk ....................40

**CLASS ACTION ALLEGATIONS**.......................................................... **41**

**EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT** ................... **43**

**FIRST CLAIM FOR RELIEF** ................................................................. **44**

**SECOND CLAIM FOR RELIEF** ............................................................. **46**

**THIRD CLAIM FOR RELIEF** ................................................................ **47**

**FOURTH CLAIM FOR RELIEF**............................................................. **47**

**PRAYER FOR RELIEF** ........................................................................ **48**

**DEMAND FOR JURY TRIAL** ............................................................... **48**

Plaintiffs Budo Trading LLC, Thomas Gramatis, Kohl Trading LLC, M & N Trading, L.L.C., Port 22, LLC, Charles Herbert Proctor, III, Robert Charles Class A, L.P., Rock Capital Markets, LLC, and Synova Asset Management, LLC (collectively, "Plaintiffs"), complain upon knowledge, as to themselves and their own actions, and upon information and belief, as to all other matters, against Defendants JPMorgan Chase & Co. ("JPMC"), J.P. Morgan Securities LLC ("JPMS"), J.P. Morgan Clearing Corp., J.P. Morgan Futures, Inc., and John Doe 1-50 (collectively, "Defendants"). Plaintiffs bring this class action for damages and allege as follows:

## NATURE OF THE ACTION

1.      This action arises from Defendants' unlawful and intentional manipulation of U.S. Treasury futures contracts and options on U.S. Treasury futures contracts ("Treasury Futures") that traded on United States-based exchanges, including but not limited to the Chicago Mercantile Exchange ("CME"), including its subsidiary the Chicago Board of Trade ("CBOT") during the period of at least April 1, 2008 through January 2016 (the "Class Period") in violation of the Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.* (the "CEA"), and common law.

2.      During the Class Period, Defendants engaged in a scheme "involving thousands of episodes of unlawful trading in the markets for U.S. Treasury futures contracts."[1]

3.      Treasury Securities are marketable debt securities issued by the United States government that earn interest (known as coupon payments) through maturity when the "par" amount (equal to the principal) is returned to the owner.  Treasury Futures are standardized agreements to buy or sell a commodity, such as Treasury notes or bonds, at a date in the future.

---

[1] *See* Press Release, *JPMorgan Chase & Co. Agrees To Pay $920 Million in Connection with Schemes to Defraud Precious Metals and U.S. Treasuries Markets*, Department of Justice (Sept. 29, 2020), *available at*: https://www.justice.gov/opa/pr/jpmorgan-chase-co-agrees-pay-920-million-connection-schemes-defraud-precious-metals-and-us.

4.      On September 25, 2020, JPMC, JPMS, and JPMorgan Chase Bank, N.A. entered into a Deferred Prosecution Agreement ("DPA") with the United States Department of Justice Criminal Division, Fraud Section, and the United States Attorneys' Office for the District of Connecticut to resolve criminal charges related to a scheme to defraud other market participants in thousands of episodes of unlawful trading in the Treasury Futures market between at least 2008 through 2016.[2]

5.      Four days later, on September 29, 2020, the CFTC issued an order ("CFTC Order") filing and settling charges against JPMC, JPMS, and JPMorgan Chase Bank, N.A. for manipulative and deceptive conduct and spoofing that spanned at least 2008 through 2016 and involved hundreds of thousands of spoof orders in U.S. Treasury and precious metals futures contracts on the Commodity Exchange, Inc. ("COMEX"), the New York Mercantile Exchange ("NYMEX"), and the CBOT.[3]

6.      On September 29, 2020, the U.S. Securities and Exchange Commission ("SEC") also issued an order ("SEC Order") announcing charges against JPMS for engaging in manipulative trading of U.S. Treasury Securities.[4]

---

[2] Deferred Prosecution Agreement, *United States of America v. JPMorgan Chase & Co.* (Sept. 25, 2020) *available at*: https://www.justice.gov/opa/press-release/file/1320576/download (hereinafter, "DPA").

[3] Order Instituting Proceedings Pursuant to Section 6(c) and (d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions, *In the Matter of JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., and J.P. Morgan Securities LLC*, Commodity Futures Trading Commission, No. 20-69 (Sept. 29, 2020), *available at*: https://www.cftc.gov/media/4826/enfjpmorganchaseorder092920/download (hereinafter, "CFTC Order").

[4] Order Instituting Administrative and Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 15(b) of the Securities Exchange Act of 1934, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order, *In the Matter of J.P. Morgan Securities LLC*, Securities and Exchange Commission (Sept. 29, 2020), *available at*: https://www.sec.gov/litigation/admin/2020/33-10858.pdf (hereinafter, "SEC Order").

7.     Under the terms of the DPA, CFTC Order, and SEC Order, JPMorgan paid more than $920 million in criminal monetary penalties, criminal disgorgement, and victim compensation in connection with Defendants' manipulation of, among other things, the Treasury Futures market.[5]

8.     Defendants manipulated the prices of Treasury Futures by employing a classic manipulative device known as "spoofing," whereby Defendants placed orders for Treasury Futures to send false and illegitimate supply and demand signals to an otherwise efficient market and then canceled those orders before execution.  As a result, Defendants caused Treasury Futures prices to be artificial throughout the Class Period to benefit their trading positions financially, at the expense of other investors, like Plaintiffs and the Class.

9.     Throughout the Class Period, Defendants repeated the scheme and successfully manipulated the Treasury Futures market to artificial levels.

10.     Defendants acknowledged that during the Class Period, Defendants and their traders "knowingly and intentionally placed orders to buy and sell U.S. Treasury Products with the intent to cancel those orders before execution . . . including in an attempt to profit by deceiving other market participants through false and fraudulent pretenses and representations concerning the existence of genuine supply and demand for U.S. Treasury Products."[6]

11.     Pursuant to the terms of the DPA, JPMorgan "admit[ted], accept[ed], and acknowledge[d] that they are responsible under United States law for the acts of their officers, directors, employees, and agents as charged in the Information, and as set forth in the Statement of

---

[5] DPA at ¶ 7.

[6] Information, *United States of America v. JPMorgan Chase & Co.*, ¶¶ 11, 15, *available at*: https://www.justice.gov/opa/press-release/file/1320581/download (hereinafter "Information").

Facts, and that the allegations described in the Information and the facts described in the Statement of Facts are true and accurate."[7]

12. Similarly, the SEC Order notes that JPMS "admits [to] the facts set forth in Section III," including JPMS's deceptive conduct, the representative Spoof Orders, and that JPMS "willfully violated Section 17(a)(3) of the Securities Act, which prohibits any person, in the offer or sale of securities, from engaging in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."[8] JPMS also acknowledged "that its conduct violated the federal securities laws."[9]

13. This is not the only time Defendants have used spoofing to manipulate futures prices. The regulatory investigation into Defendants' trading practices in the Treasury Futures market comes on the heels of ongoing regulatory investigations including spoofing the precious metals futures markets. Beginning in 2018, the U.S. Department of Justice ("DOJ") criminally charged several of Defendants' employees, including Michael Nowak, head of the precious metals trading desk, for their roles in manipulating the prices of precious metals futures contracts.[10] Two employees, John Edmonds and Christian Trunz, have since pled guilty and are cooperating with the ongoing federal criminal investigation and prosecution.[11] Similarly, the Commodity Futures Trading Commission ("CFTC") has imposed civil penalties and sanctions against certain of those same individuals.

---

[7] DPA at ¶ 2; *see also* DPA SOF at 1 (stating that JPMC, JPMorgan Chase Bank, N.A., and JPMS "hereby agree and stipulate that the following information is true and accurate.").

[8] SEC Order at Section III, ¶¶ 4-13.

[9] SEC Order at Section II.

[10] Indictment, *U.S. v. Smith*, No. 19 CR 669 (N.D. Ill Aug. 22, 2019).

[11] *See United States v. Edmonds*, No. 3:18 CR 00239 (D. Conn. 2019); Order Instituting Proceedings Pursuant to Section 6(C) and (D) of the Commodity Exchange Act, Making Findings, And Imposing Remedial Sanctions, *In the Matter of John Edmonds*, CFTC No. 19-16 (July 25, 2019); *United States v. Trunz*, No. 1:19 CR 00375 (E.D.N.Y. 2019); Order Instituting Proceedings Pursuant to Section 6(C) and (D)

14.     Plaintiffs' allegations and claims are made on information and belief (except as to allegations specifically pertaining to Plaintiffs, which are made on personal knowledge) based on the investigation conducted by and under the supervision of Plaintiffs' counsel.  That investigation included reviewing and analyzing information concerning the Treasury market, which Plaintiffs (through their counsel) obtained from, among other sources: (1) reports about the Treasury market; (2) publicly available press releases, news articles, and other media reports related to investigations into manipulation of Treasury Futures; (3) documents concerning Defendants' business practices made available through private civil litigation as well as formal investigations and enforcement proceedings, including by the DOJ and CFTC; and (4) Defendants' SEC filings and other public reports about Defendants.

15.     Given the concealed and secretive nature of Defendants' manipulation, more evidence supporting the allegations in this Complaint will be uncovered after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) because this action arises under Section 22 of the CEA, 7 U.S.C. § 25.  This Court also has jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claim that they form part of the same case or controversy.

17.     Venue is proper in the Southern District of New York, pursuant to 28 U.S.C. § 1391(b), (c), and (d), and Section 22 of the CEA, 7 U.S.C. § 25(c).  One or more of the Defendants resided, transacted business, were found, or had agents in the District.  Indeed, New York, New York is a major hub of the Treasury trading activity at issue in this litigation and is the location of key

---

of the Commodity Exchange Act, Making Findings, And Imposing Remedial Sanctions, *In the Matter of Christian Trunz*, CFTC No. 19-26 (Sept. 16, 2019).

witnesses and documents.  As such, a significant part of the events giving rise to the claims occurred in the Southern District of New York.

18.     Defendants, directly and indirectly, made use of the means and instrumentalities of interstate commerce, or the instrumentalities of transportation or communication in interstate commerce, or of the mails in connection with the unlawful acts and practices and courses of business alleged in this Complaint.  Treasury Futures are commodities that trade in interstate commerce in the United States.

## THE PARTIES

### I.     Plaintiffs

19.     Plaintiff Budo Trading LLC ("Budo") was at all relevant times a Delaware limited liability company.  Plaintiff Budo transacted in Treasury Futures during the Class Period, including purchases and sales of futures on the CBOT and was injured and suffered losses from trading at artificial prices proximately caused by Defendants' unlawful manipulation.  Defendants spoofed the market for Treasury Futures throughout the Class Period, which deprived Plaintiff Budo and the Class of the ability to transact in a lawful market that was free of manipulation.  As a direct and proximate result of the wrongdoing alleged herein, Plaintiff Budo was harmed as described below and suffered economic injury as a result.

20.     Plaintiff Thomas Gramatis ("Gramatis") was at all relevant times an Illinois resident. Plaintiff Gramatis transacted in Treasury Futures during the Class Period, including purchases and sales of futures on the CBOT and was injured and suffered losses from trading at artificial prices proximately caused by Defendants' unlawful manipulation.  Defendants spoofed the market for Treasury Futures throughout the Class Period, which deprived Plaintiff Gramatis and the Class of the ability to transact in a lawful market that was free of manipulation.  As a direct and proximate result

of the wrongdoing alleged herein, Plaintiff Gramatis was harmed as described below and suffered economic injury as a result.

21.     Plaintiff Kohl Trading LLC ("Kohl Trading") was at all relevant times a Delaware limited liability company with an office in Chicago, Illinois.  Plaintiff Kohl Trading transacted in Treasury Futures during the Class Period, including purchases and sales of futures on the CBOT and was injured and suffered losses from trading at artificial prices proximately caused by Defendants' unlawful manipulation.  Defendants spoofed the market for Treasury Futures throughout the Class Period, which deprived Plaintiff Kohl Trading and the Class of the ability to transact in a lawful market that was free of manipulation.  As a direct and proximate result of the wrongdoing alleged herein, Plaintiff Kohl Trading was harmed as described below and suffered economic injury as a result.

22.     Plaintiff M & N Trading, L.L.C. ("M&N Trading") was at all relevant times a limited liability company headquartered in Chicago, Illinois.  Plaintiff M&N Trading transacted in Treasury Futures during the Class Period, including purchases and sales of futures on the CBOT and was injured and suffered losses from trading at artificial prices proximately caused by Defendants' unlawful manipulation.  Defendants spoofed the market for Treasury Futures throughout the Class Period, which deprived Plaintiff M&N Trading and the Class of the ability to transact in a lawful market that was free of manipulation.  As a direct and proximate result of the wrongdoing alleged herein, Plaintiff M&N Trading was harmed as described below and suffered economic injury as a result.

23.     Plaintiff Port 22, LLC ("Port 22") was at all relevant times an Illinois limited liability company.  Plaintiff Port 22 transacted in Treasury Futures during the Class Period, including purchases and sales of futures on the CBOT and was injured and suffered losses from trading at artificial prices proximately caused by Defendants' unlawful manipulation.  Defendants spoofed the market for Treasury Futures throughout the Class Period, which deprived Plaintiff Port 22 and the Class of the ability to transact in a lawful market that was free of manipulation.  As a direct and proximate result

of the wrongdoing alleged herein, Plaintiff Port 22 was harmed as described below and suffered economic injury as a result.

24.     Plaintiff Charles Herbert Proctor, III ("Proctor") was at all relevant times a Michigan resident.  Plaintiff Proctor transacted in Treasury Futures during the Class Period, including purchases and sales of futures on the CBOT and was injured and suffered losses from trading at artificial prices proximately caused by Defendants' unlawful manipulation.  Defendants spoofed the market for Treasury Futures throughout the Class Period, which deprived Plaintiff Proctor and the Class of the ability to transact in a lawful market that was free of manipulation.  As a direct and proximate result of the wrongdoing alleged herein, Plaintiff Proctor was harmed as described below and suffered economic injury as a result.

25.     Plaintiff Robert Charles Class A, L.P. ("RCA") was at all relevant times a California limited partnership.  Plaintiff RCA transacted in Treasury Futures and Options on Treasury Futures during the Class Period, including purchases and sales of futures on the CBOT and was injured and suffered losses from trading at artificial prices proximately caused by Defendants' unlawful manipulation.  Defendants spoofed the market for Treasury Futures throughout the Class Period, which deprived Plaintiff RCA and the Class of the ability to transact in a lawful market that was free of manipulation.  As a direct and proximate result of the wrongdoing alleged herein, Plaintiff RCA was harmed as described below and suffered economic injury as a result.

26.     Plaintiff Rock Capital Markets, LLC ("Rock Capital") was at all relevant times an Illinois limited liability company.  Plaintiff Rock Capital transacted in Treasury Futures during the Class Period, including purchases and sales of futures on the CBOT and was injured and suffered losses from trading at artificial prices proximately caused by Defendants' unlawful manipulation. Defendants spoofed the market for Treasury Futures throughout the Class Period, which deprived Plaintiff Rock Capital and the Class of the ability to transact in a lawful market that was free of

manipulation. As a direct and proximate result of the wrongdoing alleged herein, Plaintiff Rock Capital was harmed as described below and suffered economic injury as a result.

27. Plaintiff Synova Asset Management, LLC ("Synova") was at all relevant times an Arizona limited liability company. Plaintiff Synova transacted in Treasury Futures and Options on Treasury Futures during the Class Period, including purchases and sales of futures on the CBOT and was injured and suffered losses from trading at artificial prices proximately caused by Defendants' unlawful manipulation. Defendants spoofed the market for Treasury Futures throughout the Class Period, which deprived Plaintiff Synova and the Class of the ability to transact in a lawful market that was free of manipulation. As a direct and proximate result of the wrongdoing alleged herein, Plaintiff Synova was harmed as described below and suffered economic injury as a result.

## II.   Defendants

### A.   JPMorgan Chase & Co.

28. Defendant JPMorgan Chase & Co. ("JPMC") is a Delaware financial services holding company headquartered at 270 Park Avenue, New York, New York 10005.

### B.   J.P. Morgan Securities LLC

29. Defendant J.P. Morgan Securities LLC ("JPMS") is a Delaware company, and its principal place of business is located at 277 Park Avenue, New York, New York 10172. JPMS is registered with the SEC as a broker-dealer and investment adviser. JPMS is also a registered futures commission merchant ("FCM"). JPMS operates as a wholly owned subsidiary of JPMorgan Chase & Co. During the Class Period, JPMS, including its predecessors, served as a primary dealer of U.S. Treasury Securities and transacted in U.S. Treasury-based instruments, including Treasury Futures.

### C.   J.P. Morgan Clearing Corp.

30. Defendant J.P. Morgan Clearing Corp. is a Delaware corporation headquartered at 4 Chase Metrotech Center, Brooklyn, New York 11245. J.P. Morgan Clearing Corp. offers securities

and futures clearing, settlement, lending, and related services to traders, hedge fund managers, broker-dealers, and investment advisors. It also provides operational and administrative services for registered broker-dealers.

### D.   J.P. Morgan Futures, Inc.

31.     Defendant J.P. Morgan Futures, Inc. (now known as and merged into J.P. Morgan Securities LLC) was a Delaware corporation headquartered in New York, New York until June 1, 2011, when it was acquired by J.P. Morgan Securities LLC.

32.     Collectively, the individual J.P. Morgan Defendants are referred to as "JPMorgan."

### E.   John Doe Defendants

33.     Defendants John Doe 1-50 are persons and entities employed by or affiliated with JPMorgan or others that directly or indirectly inappropriately influenced or attempted to influence the trading and prices of Treasury Futures.

34.     The defined term "Defendants" also includes John Doe Defendants.

35.     During the Class Period, Defendants' subsidiaries or other affiliates of Defendants joined and furthered the manipulation of Treasury Futures, at artificial prices not reflecting fundamental supply and demand, to Defendants' direct benefit. The defined term "Defendants" also includes each Defendant's parent companies, subsidiaries, predecessors and successors, affiliates, agents, and employees.

36.     Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its directors, officers, employees, or agents while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

37.     Each of the Defendants acted as the agent of, or participated in a joint venture for, the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

## FACTUAL ALLEGATIONS

I.     **Relevant Factual Background**

A.     **Overview of Treasury Securities**

38.     **U.S. Treasury Securities.** The U.S. Treasury sells marketable securities in the form of bills, notes, and bonds to institutional and individual investors through investment companies and banks at public auctions. This debt is subject to fixed terms, *e.g.*, 2-year, 5-year, 10-year, and 30-year terms, at fixed interest rates determined by the prevailing interest rates in the marketplace at the time of issuance of the bonds. Treasury bills, notes, and bonds are referred to as marketable securities because after they are sold in auctions, they are generally bought and sold in the secondary cash market at prevailing prices from dealers in government securities. Many instruments bought and sold by market participants are also linked to Treasury yields/prices. As of December 2020, more than $20 trillion in U.S. Treasury Securities were outstanding.[12]

39.     **U.S. Treasury Bills.** U.S. Treasury bills ("T-Bills") are Treasury bills with maturities ranging from four (4) weeks to fifty-two (52) weeks. T-Bills are purchased at a discount to par value (*i.e.*, face value) as they do not pay interest prior to maturity.

40.     **U.S. Treasury Notes.** U.S. Treasury notes ("T-Notes") have maturities between 1-year to 10-years and are issued with maturities of two (2), three (3), five (5), seven (7), and ten (10) years. T-Note interest is paid semiannually, and the principal is paid upon maturity.

---

[12] The Bureau of the Fiscal Service, *Monthly Statement of the Public Debt of the United States* (Dec. 31, 2020), *available at*: https://www.treasurydirect.gov/govt/reports/pd/mspd/2020/opds122020.pdf.

41. **U.S. Treasury Bonds.** U.S. Treasury bonds ("T-Bonds") are Treasury bonds with original maturities of greater than ten (10) years at time of issuance. T-Bond interest is paid semiannually, and the principal is paid upon maturity.

42. T-Bills, T-Notes, and T-Bonds have two sides: the "long" side, which is the buy side of the security, and the "short" side, which is the sell side of the security. T-Notes and T-Bonds are priced based on their par value, the public demand for the debt, prevailing interest rate yields, and coupon rate. The par value is the face value of the T-Note or T-Bond. The coupon rate is the annual interest rate, as a percentage of par value, paid on a T-Note or T-Bond as determined by the U.S. Treasury Department. For example, a $1,000,000 T-Note with a coupon rate of 3% will pay $30,000 a year total, paid as two $15,000 semiannual payments.

### B. Overview of Treasury Futures

#### 1. Overview of Key Terms

43. **Commodity Futures Contract.** A commodity futures contract is a standardized bilateral executory agreement for the purchase and sale of a particular commodity at a specified price and time in the future. In the context of futures trading, a commodity is the underlying instrument upon which a futures contract is based. The commodity underlying a futures contract can be a physical commodity, *e.g.*, corn or silver, or a financial instrument, *e.g.*, Treasury bills, foreign currencies, or the value of a stock index. Pursuant to Section 5 of the CEA, 7 U.S.C. § 7, Designated Contract Markets ("DCMs") such as CME, CBOT, NYMEX, and COMEX specify the terms for each of the futures and options contracts they list, including the underlying commodity, trading units, price quotation, trading hours, trading months, minimum and maximum price fluctuation, and margin requirements.

44. **"Long" and "Short" Futures.** Futures contracts represent a commitment to make (in the case of a short contract) or take (long contracts) "delivery" of the underlying commodity at a

defined point in the future.  Treasury Futures are deliverable upon expiry.  However, futures contracts can also be offset prior to expiration.

45.   **Offset by Trading.**  Futures market participants almost always "offset" their futures contracts before the expiration month when delivery or settlement occurs.  For example, a purchaser of one futures contract may liquidate, or cancel or offset, a future obligation to take delivery of the commodity underlying that contract by selling one equivalent futures contract.  This sale of one contract offsets or liquidates the earlier purchase of another contract.  The difference between the initial purchase price and the sale price represents the realized profit or loss for the trader.

46.   **Options Contract**.  An options contract is an agreement that gives the buyer, or "option holder," the right, but not the obligation, to either buy or sell something at a specified price during a specified time period.  The buyer of an option pays an "option premium" to the seller for the right to buy (call) or sell (put) the underlying commodity (in this case, Treasury Futures).

47.   **Call option.**  A call option confers upon the buyer the right, but not the obligation, to buy the commodity at the specified price (the "strike" price).  Call options confer upon the seller, or "option writer," the obligation to sell the commodity at the strike price.  The buyer (the "long" or "option holder") of one call option wants the value of the underlying commodity to increase so that the buyer can exercise the option at a price less than the underlying commodity is worth and make a profit.  The seller (person that is "short") of a call option wants to avoid having to sell the underlying commodity at a price below market value.  Therefore, a trader that purchases a call option will make money as the value of the underlying asset increases and lose money as it decreases.

48.   **Put options.**  A put option confers upon the buyer the right, but not the obligation, to sell the underlying commodity at the strike price and confers upon the seller the obligation to buy the underlying commodity at the strike price if the option is exercised.  The buyer of one put contract wants the value of the underlying commodity to decrease so that the buyer can sell the commodity at

above a market price. Conversely, the seller of the put option wants the price of the underlying asset to stay at or above the strike price of the put option so that the seller of the option would not be forced to buy the underlying futures contract at an above-market price.

49. **Treasury Futures.** Treasury Futures are deliverable baskets of U.S. Treasuries, fixed-income securities issued and backed by the U.S. government to finance debt.[13] Treasury Futures provide market participants the ability to manage their interest rate exposure. Like other commodity futures contracts, a Treasury Futures contract is a standardized agreement to buy or sell a commodity, such as Treasury notes or bonds, at a date in the future.

50. Since the first Treasury Futures products were launched over forty (40) years ago, CBOT Treasury Futures have become one of the CME's core interest rate products. Presently, Treasury Futures primarily trade through CME Globex, though certain option contracts are still traded through open outcry. During the Class Period, U.S. Treasury Futures traded on the CBOT included: (i) 2-year T-Note Futures; (ii) 5-year T-Note Futures; (iii) 10-year T-Note Futures; (iv) U.S. Treasury Bond Futures; (v) Ultra 10-year T-Note Futures; and (vi) Ultra U.S. Treasury Bond Futures. Options are generally available on U.S. Treasury Futures contracts. Treasury Futures contracts have two sides: the "long" side, which is the buy side of the contract; and the "short" side, which is the sell side of the contract. According to the CME, in February 2021, the average daily volume was 8.4 million Treasury Futures contracts and 1.5 million Options on Treasury Futures contracts.[14]

### 2. The CME Group

51. The CME Group Inc. ("CME Group") is one of the world's largest derivatives exchanges. Its global headquarters is located at 20 South Wacker Drive, Chicago, Illinois 60606. In

---

[13] As set forth above, references to Treasury Futures are to CBOT Treasury Futures and Options on CBOT Treasury Futures contracts, unless otherwise noted.

[14] CME Group Exchange ADV Report - Monthly (February 2021), *available at*: https://www.cmegroup.com/daily_bulletin/monthly_volume/Web_ADV_Report_CMEG.pdf.

2007, the CME Group merged with the Chicago Board of Trade ("CBOT"), a Designated Contract Market offering products subject to CBOT rules and regulations.  CBOT brought a suite of interest rates, agricultural, and equity index products to CME Group's existing offering.  Today, the CME Group is made up of at least four exchanges, CME, CBOT, NYMEX, and COMEX.  Each exchange offers a wide range of global benchmarks across major asset classes.

52.     The CME Group also owns and operates CME Globex, an electronic trading platform that is used to trade futures and options contracts.  Because CME Globex is an open access marketplace, it allows market participants to directly enter their own trades and participate in the trading process, including viewing the order book and real-time price data nearly 24 hours a day.  CME Globex is subject to CME rules including those that (a) govern the conduct of CME Globex users and (b) provide for disciplinary sanctions including but not limited to exclusion from trading.

53.     CME Globex utilizes an electronic "Order Book" that displays quantities of anonymous orders or offers to sell futures contracts and bids to buy futures contracts at various price points or "levels."  An "order" is a request to buy (a "bid") or sell (an "offer" or "ask").  The highest price at which someone is willing to buy is referred to as the best-bid level, or first-bid level.  The best-ask level, or first-ask level, is the lowest price at which someone is willing to sell.  The bid-ask spread is the difference between these two prices.

54.     Quotes to buy or sell are entered into the order book, which allows market participants to see the visible number of orders and the visible total number of contracts that all traders are actively bidding or offering at a given price level.  The identities of traders who submit quotes into the order book are anonymous.  Thus, here for instance, market participants could not tell if Defendants serially placed and then cancelled orders on opposite sides of the market.

55.     Traders can view the aggregate resting contracts and orders up to the tenth bid and tenth-ask levels.  This combined bid and ask information is often referred to as the visible order book

and represents the visible market depth (an illustrative example of a visible order book is contained in FIGURE 1). Traders use the information contained in the order book to make trading decisions.



**FIGURE 1.**

56.     An "aggressive order" is an order that crosses the bid-ask spread, meaning the order is placed at a price where there is already a counterparty willing to take the other side of a trade, *i.e.*, the order is placed at a price where another trader is already willing to transact. Practically speaking, an aggressive buy order would be placed at the first-offer level or higher; and an aggressive sell order would be placed at the first-bid level or lower. Accordingly, aggressive orders are guaranteed to execute, at least in part, immediately after being placed.

57.     By contrast, a "passive order" does not give up the spread in price. On the buy side of the market, a passive buy order is placed at the best-bid price or lower, *i.e.*, it is an offer to buy at a price that is lower than the price that other traders are currently willing to sell. A passive sell order

would be placed at the best-offer/ask price or higher.  Passive orders rest for at least some amount of time after being placed and are not guaranteed to execute.

58.     CME Globex bids and offers for outright futures are matched according to an algorithm on a first-in, first-out ("FIFO") basis.  Under the FIFO order matching method, orders on the same side of the market (*i.e.*, the buy side or the sell side) and at the same price are filled based on time priority.  Thus, as a general rule, the order that was placed first trades first, irrespective of the order's size.  Iceberg orders are an exception; for iceberg orders, once the visible quantity is completely filled, the replenishment quantity goes to the back of the time priority queue.  Iceberg orders refer to large single orders that are divided into smaller limit orders for the purpose of hiding the actual order quantity.  The term "iceberg" comes from the fact that the visible lots are just the "tip of the iceberg" given the greater number of limit orders ready to be placed.

### C.     The Mechanics of Spoofing

59.     The U.S. Treasury Futures market is susceptible to manipulation.  "Spoofing" is a manipulative trading device used to create artificial prices in markets.  Specially, the practice entails submitting and/or canceling bids or offers with the intent to create artificial price movements upwards or downwards.

60.     Spoofing works by using orders to create a false impression of supply or demand that impacts futures contract prices.  For example, if a trader wants to buy at an artificially lower price, he may place an order (this could also be called a "Primary Order"), often in the form of an iceberg order, to buy Treasury Futures contracts at a price below the lowest ask price then available in the market, *i.e.*, a price lower than where any market participant would be willing to sell.  The trader will then spoof prices lower by placing one or more large orders—orders the trader never intends to execute— to *sell* a substantial amount of the same contract on the opposite side of the market.  These orders are called the "spoof orders."  Spoof orders are made at a price that is at or above the first-ask level (the

lowest ask price available in the market), meaning that they are passive orders that will not be immediately filled.  These large orders falsely signal that investors are selling their Treasury Futures contracts, causing prices to decrease (in response to the apparent increase in supply), toward the price at which the trader entered the initial buy order.  The manipulator cancels the large spoof orders before they get filled so the trader never enters a transaction at that price level.

61.    FIGURES 2a and 2b below show the order book imbalance that spoofing causes. FIGURE 2a is a hypothetical order book.  The best bid is two ticks away from the best offer and, therefore, no executable trades are present.  For the purposes of this example, the order book begins fairly balanced, with roughly even numbers of contracts being offered and bid.  FIGURE 2b shows that same hypothetical order book after a series of orders have been entered, namely an iceberg buy order that has been placed to buy 200 contracts, but only shows twelve (12) contracts to the market at a time.  Then, spoof orders are placed on the opposite side of the market: one order, placed with an order splitter, for 200 contracts is placed at the first offer level; an additional order for 100 contracts is also placed at the first offer level; and a third order for 250 contracts is placed, using an order splitter, at the second offer level.  Following these spoof orders, the order book shows a significant imbalance, giving the appearance of far more sellers in the market than buyers, which signals artificial supply to market participants and leads to artificial, downward price pressure.

Order Book Before the Spoofing Begins

| Price/ Level | Number of Orders to Buy | Number of Contracts Bid | Number of Orders to Sell | Number of Contracts Offered |
|---|---|---|---|---|
| 105.5 | | | 15 | 187 |
| 104.5 | | | 8 | 94 |
| 104 | | | 12 | 144 |
| 103.5 | | | 14 | 269 |
| 103 | | | 6 | 87 |
| 102.5 | | | 11 | 124 |
| 101.5 | | | 10 | 356 |
| 101 | | | 11 | 243 |
| 100.5 | | | 19 | 312 |
| 100 | | | 15 | 428 |
| | | | | |
| 99 | 16 | 345 | | |
| 98.5 | 19 | 253 | | |
| 98 | 9 | 264 | | |
| 97.5 | 13 | 192 | | |
| 97 | 12 | 350 | | |
| 96.5 | 8 | 241 | | |
| 95.5 | 6 | 165 | | |
| 95 | 9 | 110 | | |
| 94 | 12 | 212 | | |
| 94.5 | 15 | 132 | | |
| **TOTAL**: | 119 | 2264 | 121 | 2244 |

FIGURE 2a.

19



**FIGURE 2b.**

62. The same technique can also be used in reverse to manipulate prices artificially higher. For example, a trader can place an order to sell Treasury Futures contracts at well above the current market prices and then, by entering and canceling large orders to buy that same futures contract, send an artificial signal of increased demand to the market that drives futures prices higher towards the level of the trader's initial sell order.

63. In each instance, the trader profits because spoofing allows the trader to buy Treasury Futures contracts below the current market price or to sell Treasury Futures contracts above the current market price. The CFTC has described spoofing as "a particularly pernicious example of bad

actors seeking to manipulate the market through the abuse of technology."[15]  James McDonald, the CFTC's former Director of Enforcement, remarked that:

> The advent of the electronic order book brought with it significant benefits to our markets—it increased information available, reduced friction in trading, and significantly enhanced the price discovery process.  But at the same time, this technological development has presented new opportunities for bad actors.  Just as the electronic order book increases information available to traders, it creates the possibility that false information injected into the order book could trick them into trading to benefit a bad actor.[16]

64.     Traders engaged in spoofing gain an unfair and unlawful advantage over other market participants, hindering competition, undermining market integrity, and harming law-abiding victims. As alleged here, Defendants' use of spoofing and other manipulative conduct harmed Plaintiffs and the Class members who purchased or sold Treasury Futures at artificial prices during the Class Period.

## II.     Evidence of Defendants' Misconduct

### A.     Overview of Government Settlements

65.     On September 25, 2020, JPMC, JPMS, and JPMorgan Chase Bank, N.A. entered into a Deferred Prosecution Agreement ("DPA") with the United States Department of Justice Criminal Division, Fraud Section, and the United States Attorneys' Office for the District of Connecticut to resolve criminal charges related to a scheme to defraud other market participants in: (1) thousands of episodes of unlawful trading in the markets for Treasury Futures and in the secondary cash market for U.S. Treasury notes and bonds (collectively, "U.S. Treasury Products"); and (2) tens of thousands of episodes of unlawful trading in the markets for precious metals futures contracts.[17]

---

[15] *See* Press Release, *Statement of CFTC Director of Enforcement James McDonald*, CFTC (January 29, 2018), *available at*: https://www.cftc.gov/PressRoom/SpeechesTestimony/mcdonaldstatement012918.

[16] *See* Press Release, *Statement of CFTC Director of Enforcement James McDonald*, CFTC (Nov. 14, 2018), *available at*: https://www.cftc.gov/PressRoom/SpeechesTestimony/opamcdonald1.

[17] *See* Press Release, *JPMorgan Chase & Co. Agrees to Pay $920 Million in Connection with Schemes to Defraud Precious Metals and U.S. Treasuries Markets*, Department of Justice (Sept. 29, 2020), *available at*:

66.     Pursuant to the terms of the DPA, JPMorgan paid more than $920 million in criminal monetary penalties, criminal disgorgement, and victim compensation.[18]

67.     Under the DPA and Information, JPMorgan acknowledged that during the Class Period JPMorgan and its traders "knowingly and intentionally placed orders to buy and sell U.S. Treasury Products with the intent to cancel those orders before execution . . . including in an attempt to profit by deceiving other market participants through false and fraudulent pretenses and representations concerning the existence of genuine supply and demand for U.S. Treasury Products."[19]

68.     Pursuant to the terms of the DPA, JPMorgan "admit[ted], accept[ed], and acknowledge[d] that they are responsible under United States law for the acts of their officers, directors, employees, and agents as charged in the Information, and as set forth in the Statement of Facts, and that the allegations described in the Information and the facts described in the Statement of Facts are true and accurate."[20]  JPMorgan further expressly agreed that they "shall not, through present or future attorneys, officers, directors, employees, agents . . . make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Company [JPMorgan Chase & Co.] and the Related Entities [JPMorgan Chase Bank, N.A. and J.P. Morgan Securities LLC] set forth above [in the DPA] or the facts described in the attached Statement of Facts."[21]

69.     The DPA also requires JPMorgan to self-report violations of the federal anti-fraud laws and to cooperate in any future criminal investigations.

---

https://www.justice.gov/opa/pr/jpmorgan-chase-co-agrees-pay-920-million-connection-schemes-defraud-precious-metals-and-us.

[18] DPA at ¶ 7.

[19] Information at ¶¶ 11, 15.

[20] DPA at ¶ 2; *see also* DPA SOF at 1 (stating that JPMorgan Chase & Co., JP Morgan Chase Bank, N.A., and JPMS "hereby agree and stipulate that the following information is true and accurate.").

[21] DPA at ¶ 30.

70.     On September 29, 2020, the SEC issued an order ("SEC Order") announcing charges against JPMS for fraudulently engaging in manipulative trading of U.S. Treasury securities.  JPMS admitted to the misconduct and agreed to pay disgorgement of $10 million and a civil penalty of $25 million to settle the action.

71.     The SEC Order notes that JPMS "admits [to] the facts set forth in Section III," including JPMS's deceptive conduct, the representative Spoof Orders, and that JPMS "willfully violated Section 17(a)(3) of the Securities Act, which prohibits any person, in the offer or sale of securities, from engaging in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."[22]  JPMS also acknowledged "that its conduct violated the federal securities laws."[23]

72.     That same day, the CFTC issued an order ("CFTC Order") filing and settling charges against JPMC, JPMS, and JPMorgan Chase Bank, N.A. for manipulative and deceptive conduct and spoofing that spanned at least 2008 through 2016 and involved hundreds of thousands of spoof orders in U.S. Treasury and precious metals futures contracts on the Commodity Exchange, Inc., the New York Mercantile Exchange, and the Chicago Board of Trade.[24]

73.     In the CFTC Order, the CFTC found that JPMorgan's illegal trading significantly benefited JPMorgan and harmed other market participants.  JPMorgan was required to pay a total of $920.2 million - the largest amount of monetary relief ever imposed by the CFTC - including the highest total restitution ($311,737,008), disgorgement ($172,034,790), and civil monetary penalty ($436,431,811) in any spoofing case.[25]  Specifically, during the Class Period, JPMorgan's manipulation

---

[22] SEC Order at Section II; SEC Order at Section III, ¶¶ 4-13.

[23] SEC Order at Section II.

[24] CFTC Order at Section II.

[25] DPA at ¶ 7.

caused at least $105,744,906 in losses to market participants in the markets for U.S. Treasury Products, specifically, $33,584,906 in losses to participants in the U.S. Treasury Futures market and $72,160,000 in losses to participants in the secondary cash market for U.S. Treasury Securities.[26]

**B.    JPMorgan is an Active Participant in the U.S. Treasuries Market**

74.    Defendant J.P. Morgan Securities LLC, JPMorgan's FCM division, ranks among the world's largest FCMs.[27]   JPMS provides trade execution and clearing services to a variety of customers who transact in exchange-traded futures and options on futures contracts.[28]

75.    JPMorgan actively trades interest rate derivatives, including, but not limited to Treasury Futures and Treasury Securities.  For example, as of December 31, 2017, JPMorgan had approximately $4.9 billion of notional value in exchange-traded interest rate futures contracts outstanding.  Treasury Futures were among the interest rate futures contracts included in this figure. Similarly, during the Class Period, JPMorgan engaged in proprietary trading of Treasury Futures and Treasury Securities through its Global Rates and Rates Exotics group.  JPMorgan's Global Rates and Rates Exotics group operated as part of a "single, cohesive global unit or 'desk'" (hereinafter, "U.S. Treasuries Desk") and employed traders that worked in New York, London, and Tokyo.[29]

---

[26] DPA at ¶ 75.

[27] Based on CFTC data, JPMS ranked as the second largest FCM as of December 31, 2018.  *See 2019 Top FCMs*, ManagedFuturesInvesting.com (Feb. 19, 2019), *available at*: https://www.managed futuresinvesting.com/2019-top-fcms/.

[28] *See Commodity Futures Trading Commission Rule 1.55(K) and 1.55(O): FCM-Specific Disclosure Document for J.P. Morgan Securities LLC,* J.P. Morgan, *available at*: https://www.jpmorgan.com/content/ dam/jpm/global/disclosures/by-legal-entity/cftc155_risk_disclosure.pdf (listing customer categories including, Institutional (asset managers, pension funds, insurance companies, banks, hedge funds); Private Bank (individuals); Commercial (corporates, agricultural, energy); Proprietary (HFT, family offices)).

[29] Information at ¶ 12.

76.     Defendants' U.S. Treasuries Desk included at least New York-based Traders A through D and London-based Trader E.[30]

77.     Trader A was a New York-based Treasury trader employed with JPMS as a Managing Director.[31] During the entirety of the Class Period, Trader A was the head of JPMorgan's U.S. Treasuries Desk responsible for supervising other Treasury traders.  Trader A began working at JPMS in 2005.

78.     During the entirety of the Class Period, Trader B was a New York-based trader on JPMorgan's U.S. Treasuries Desk and was employed with JPMS as an Executive Director.[32] Trader B began working at JPMS in 2006.

79.     During the entirety of the Class Period, Trader C was a New York-based trader on JPMorgan's U.S. Treasuries Desk and was employed with JPMS as an Executive Director.[33] Trader C began working at JPMS in 2005.

80.     Trader D was a New York-based trader on JPMorgan's U.S. Treasuries Desk and was employed with JPMS as a Managing Director.[34] Trader D began working at JPMS in 2009.

81.     Throughout the Class Period, Trader E was a London-based trader on JPMorgan's U.S. Treasuries Desk and was employed with JPMorgan as an Executive Director.[35] Trader E began working at JPMorgan in 1996.

---

[30] Information at ¶ 13-14.

[31] DPA at ¶ 59.

[32] DPA at ¶ 60.

[33] DPA at ¶ 61.

[34] DPA at ¶ 62.

[35] DPA at ¶ 63.

82.     JPMorgan also employed other supervisors, salespersons, and traders on the U.S. Treasuries Desk across its New York, London, and Tokyo offices.[36]

**C.     Defendants' Manipulation of Treasury Futures**

83.     From approximately April 2008 until January 2016, JPMorgan and Traders A through E of the U.S. Treasuries Desk manipulated the prices of Treasury Futures to illegally increase their trading profits, at the expense of Plaintiffs and the Class.

84.     On thousands of occasions, JPMorgan knowingly and intentionally placed orders to buy and sell Treasury Futures with the intent to cancel those orders before execution ("Spoof Orders").

85.     Defendants placed Spoof Orders to cause artificial Treasury Futures prices and move prices in a direction that did not accurately reflect market-based forces of supply and demand.

86.     By placing Spoof Orders to *buy* Treasury Futures, JPMorgan intended to falsely signal to the market that there was increased demand, thus artificially driving up the prices of those products.

87.     Conversely, by placing Spoof Orders to *sell* Treasury Futures, JPMorgan intended to falsely signal to the market that there was an increased supply, thus artificially driving down the prices of those products.

88.     Market participants traded in a market that appeared, and they believed, to be subject to a legitimate change in supply or demand.  As a result, Defendants' manipulation caused market participants to enter sell orders below, or buy orders above, a competitive market price.

89.     Defendants' manipulation was disclosed for the first time in their 2019 Form 10-K, filed with the SEC on February 25, 2020:

---

[36] DPA at ¶ 64.

*Metals and U.S. Treasuries Investigations and Litigation and Related Inquiries*.   Various authorities, including the Department of Justice's Criminal Division, are conducting investigations relating to trading practices in the metals markets and related conduct. The Firm also is responding to related requests concerning similar trading-practices issues in markets for other financial instruments, such as U.S. Treasuries.[37]

90.   During the Class Period, JPMorgan's manipulation caused at least $105,744,906 in losses to market participants in the markets for U.S. Treasury Products, specifically, $33,584,906 in losses to participants in the U.S. Treasury Futures market and $72,160,000 in losses to participants in the secondary cash market for U.S. Treasury Securities.[38]

91.   The DPA and the CFTC Order also include representative examples of the thousands of instances of Defendants' manipulative trading.   Specific examples include the following:

### 1.   July 20, 2009 – T-Bond Futures

92.   On July 20, 2009, a JPMorgan Treasuries trader ("Trader 7") placed an order to sell 100 lots of the T-Bond Futures contract with September 2009 expiry at a price of $116.171875.   Trader 7 then began entering a series of six (6) deceptive, layered Spoof Orders on the buy side of the market totaling 1,800 lots, ranging in price from $116.078125 to $116.15625.   Trader 7's Spoof Orders artificially created the illusion of demand for T-Bond Futures, which artificially moved the price of T-Bond Futures higher.   Shortly thereafter, Trader 7's order to sell was filled in its entirety.   Having successfully manipulated the price of T-Bonds Futures higher, Trader 7 cancelled his entire Spoof Order.[39]

93.   On this same day, July 20, 2009, Plaintiff Rock Capital bought 167 T-Bond Futures contracts and Plaintiff M&N Trading bought 479 T-Bond Futures contracts.   As a result of

---

[37]   JPMorgan   Chase   &   Co.,   2019   Form   10-K,   286-87   (Feb.   25,   2020)   *available   at*: https://jpmorganchaseco.gcs-web.com/static-files/e9fce7aa-15b7-439d-8ea3-a5a30c8e2dfe.

[38] DPA at ¶ 75.

[39] CFTC Order at Section II.C.3.

Defendants' spoofing, Plaintiffs Rock Capital and M&N Trading were deprived of the ability to transact in a lawful market that was free of manipulation and caused Plaintiffs Rock Capital and M&N Trading to pay more to purchase T-Bond Futures contracts. These artificial prices caused Plaintiffs Rock Capital and M&N Trading to earn less profits or suffer greater losses in their trading of T-Bond Futures contracts during the Class Period.

### 2.      December 9, 2009 – T-Bond Futures

94.      On December 9, 2009, JPMorgan Trader B placed an order to buy twenty-five (25) T-Bond Futures contracts at $119.5625. Trader B then placed a Spoof Order to sell 5,000 T-Bond Futures contracts at $119.59375. Trader B's Spoof Orders created the illusion of supply for T-Bond Futures, which artificially moved the price of T-Bond Futures lower. Shortly after, Trader B's order to buy was filled in its entirety. Having successfully manipulated the price of T-Bonds Futures lower, Trader B cancelled his entire Spoof Order.[40]

95.      On this same day, December 9, 2009, Plaintiff Proctor sold two (2) T-Bond Futures contracts, Plaintiff Rock Capital sold 296 T-Bond Futures contracts, and Plaintiff M&N Trading sold 350 T-Bond Futures contracts. As a result of Defendants' spoofing, Plaintiffs Proctor, Rock Capital, and M&N Trading were deprived of the ability to transact in a lawful market that was free of manipulation and caused Plaintiffs Proctor, Rock Capital, and M&N Trading to receive less to sell T-Bond Futures contracts. These artificial prices caused Plaintiffs Proctor, Rock Capital, and M&N Trading to earn less profits or suffer greater losses from trading T-Bond Futures contracts during the Class Period.

---

[40] DPA at ¶ 84.

### 3.   February 4, 2010 – 10-Year T-Note Futures

96.     On February 4, 2010, JPMorgan Trader D placed an order to buy ten (10) 10-Year T-Note Futures contracts at $118.265625.  Then, Trader D placed a Spoof Order to sell 1,000 10-Year T-Note Futures contracts at $118.281250.  Trader D's Spoof Order created the illusion of supply for 10-Year T-Note Futures, which artificially moved the price of 10-Year T-Note Futures lower.  Shortly thereafter, Trader D's entire order to buy was filled.  Having successfully manipulated the price of 10-Year T-Note Futures lower, Trader D then cancelled his entire Spoof Order.[41]

97.     On this same day, February 4, 2010, Plaintiff Proctor sold ten (10) 10-Year T-Note Futures contracts, Plaintiff Kohl Trading sold 347 10-Year T-Note Futures contracts, Plaintiff Rock Capital sold 1,144 10-Year T-Note Futures contracts, and Plaintiff M&N Trading sold 7,409 10-Year T-Note Futures contracts.  As a result of Defendants' spoofing, Plaintiffs Proctor, Kohl Trading, Rock Capital, and M&N Trading were deprived of the ability to transact in a lawful market that was free of manipulation and caused Plaintiffs Proctor, Kohl Trading, Rock Capital, and M&N Trading to receive less to sell 10-Year T-Note Futures contracts.  These artificial prices caused Plaintiffs Proctor, Kohl Trading, Rock Capital, and M&N Trading to earn less profits or suffer greater losses in their trading of 10-Year T-Note Futures contracts during the Class Period.

### 4.   June 3, 2010 – T-Bond Futures

98.     On June 3, 2010, JPMorgan Trader A placed an order to sell twenty (20) T-Bond Futures contracts at $122.25000.[42]  Next, Trader A placed a Spoof Order to buy 2,000 T-Bond Futures contracts at $122.21875 intending to create the appearance of demand and artificially move the price higher.  Trader A's Spoof Order was successful as it created the illusion of demand for T-Bond Futures contracts, which artificially moved the price of T-Bond Futures contracts higher.  Trader A's order to

---

[41] DPA at ¶ 90.

[42] Trader A was the head of JPMorgan U.S. Treasuries Desk during the Class Period.

sell was then filled in its entirety.  Having successfully manipulated the price of T-Bond Futures higher, Trader A cancelled his entire Spoof Order.[43]

99.     On this same day, June 3, 2010, Plaintiff Port 22 bought 555 T-Bond Futures contracts, Plaintiff Rock Capital bought ninety-two (92) T-Bond Futures contracts, and Plaintiff M&N Trading bought 625 T-Bond Futures contracts.  As a result of Defendants' spoofing, Plaintiffs Port 22, Rock Capital, and M&N Trading were deprived of the ability to transact in a lawful market that was free of manipulation and caused Plaintiffs Port 22, Rock Capital, and M&N Trading to pay more to purchase T-Bond Futures contracts.  These artificial prices caused Plaintiffs Port 22, Rock Capital, and M&N Trading to earn less profits or suffer greater losses in their trading of T-Bond Futures contracts during the Class Period.

### 5.     July 20, 2010 – 10-Year T-Note Futures

100.     On July 20, 2010, JPMorgan Trader D placed an order to buy five (5) 10-Year T-Note Futures contracts at $123.078125.  Then, Trader D placed a Spoof Order to sell 1,000 10-Year T-Note Futures contracts at $123.093750 intending to create the appearance of supply and artificially move the price lower.  Trader D's Spoof Order was successful as it created the illusion of supply for 10-Year T-Note Futures, which caused the price of 10-Year T-Note Futures to move artificially lower. Trader D's entire order to buy was then filled.  Having successfully manipulated the price of 10-Year T-Note Futures lower, Trader D cancelled his entire Spoof Order.[44]

101.     On this same day, July 20, 2010, Plaintiff Kohl Trading sold 235 10-Year T-Note Futures contracts, Plaintiff Port 22 sold 2,738 10-Year T-Note Futures contracts, Plaintiff Rock Capital sold 478 10-Year T-Note Futures contracts, and Plaintiff M&N Trading sold 5,302 10-Year T-Note Futures contracts.  As a result of Defendants' spoofing, Plaintiffs Kohl Trading, Port 22, Rock

---

[43] DPA at ¶ 79.

[44] DPA at ¶ 91.

Capital, and M&N Trading were deprived of the ability to transact in a lawful market that was free of manipulation and caused Plaintiffs Kohl Trading, Port 22, Rock Capital, and M&N Trading to receive less to sell 10-Year T-Note Futures contracts. These artificial prices caused Plaintiffs Kohl Trading, Port 22, Rock Capital, and M&N Trading to earn less profits or suffer greater losses in their trading of 10-Year T-Note Futures contracts during the Class Period.

### 6.     January 26, 2011 – 10-Year T-Note Futures

102.    On January 26, 2011, JPMorgan Trader A placed an iceberg order to buy 200 10-Year T-Note Futures contracts at $120.40625. After ten (10) of the 200 contracts for the order were filled, Trader A placed a Spoof Order to sell 2,000 10-Year T-Note Futures contracts at $120.421875 intending to create the appearance of supply and artificially move the price lower. Trader A's Spoof Order was successful and created the illusion of supply for 10-Year T-Note Futures, which caused the price of 10-Year T-Note Futures to move artificially lower. The remaining 190 contracts on Trader A's order to buy were then filled. Having successfully manipulated the price of 10-Year T-Note Futures lower, Trader A cancelled his entire Spoof Order.[45]

103.    On this same day, January 26, 2011, Plaintiff Kohl Trading sold eighty-four (84) 10-Year T-Note Futures contracts, Plaintiff Port 22 sold 1,987 10-Year T-Note Futures contracts, Plaintiff Rock Capital sold 981 10-Year T-Notes Futures contracts, and Plaintiff M&N Trading sold 4,283 10-Year T-Notes Futures contracts. As a result of Defendants' spoofing, Plaintiffs Kohl Trading, Port 22, Rock Capital, and M&N Trading were deprived of the ability to transact in a lawful market that was free of manipulation and caused Plaintiffs Kohl Trading, Port 22, Rock Capital, and M&N Trading to receive less to sell 10-Year T-Note Futures contracts. These artificial prices caused

---

[45] DPA at ¶ 80.

Plaintiffs Kohl Trading, Port 22, Rock Capital, and M&N Trading to earn less profits or suffer greater losses in their trading of 10-Year T-Note Futures contracts during the Class Period.

### 7.   June 28, 2011 – 10-Year T-Note Futures

104.   On June 28, 2011, JPMorgan Trader C placed an order to buy 100 10-Year T-Note Futures contracts at $124.21875.  Then, Trader C placed a Spoof Order to sell 4,000 10-Year T-Note Futures contracts at $124.234375 intending to create the appearance of supply and artificially move the price lower.  Trader C's Spoof Order created the illusion of supply for 10-Year T-Note Futures, which caused the price of 10-Year T-Note Futures to move artificially lower.  Trader C's entire order to buy was then filled.  Having successfully manipulated the price of 10-Year U.S. Treasury note futures lower, Trader C cancelled his entire Spoof Order.[46]

105.   On this same day, June 28, 2011, Plaintiff Kohl Trading sold 330 10-Year T-Note Futures contracts, Plaintiff Port 22 sold 2,686 10-Year T-Note Futures contracts, Plaintiff Rock Capital sold 379 10-Year T-Note Futures contracts, and Plaintiff M&N Trading sold 6,561 10-Year T-Note Futures contracts.  As a result of Defendants' spoofing, Plaintiffs Kohl Trading, Port 22, Rock Capital, and M&N Trading were deprived of the ability to transact in a lawful market that was free of manipulation and caused Plaintiffs Kohl Trading, Port 22, Rock Capital, and M&N Trading to receive less to sell 10-Year T-Note Futures contracts.  These artificial prices caused Plaintiffs Kohl Trading, Port 22, Rock Capital, and M&N Trading to earn less profits or suffer greater losses in their trading of 10-Year T-Note Futures contracts during the Class Period.

### 8.   September 27, 2011 – 10-Year T-Note Futures

106.   On September 27, 2011, a JPMorgan Treasuries trader ("Trader 9") placed an order to buy fifty (50) lots of the 10-Year T-Note Futures contract with December 2011 expiry at a price of

---

[46] DPA at ¶ 87.

$129.578125.  Next, Trader 9 entered a Spoof Order for 3,000 lots on the sell side of the market, at a price of $129.59375.  Trader 9's Spoof Order artificially created the illusion of supply for 10-Year T-Note Futures, which caused the price of 10-Year T-Note Futures to move artificially lower.  Trader 9's fifty (50) lot order to buy was then entirely filled.  Having successfully manipulated the price of 10-Year T-Note Futures lower, Trader 9 canceled his entire sell-side Spoof Order.[47]

107.    On this same day, September 27, 2011, Plaintiff Port 22 sold 1,069 10-Year T-Note Futures contracts, Plaintiff Rock Capital sold 918 10-Year T-Note Futures contracts, and Plaintiff M&N Trading sold 4,944 10-Year T-Notes Futures contract.  As a result of Defendants' spoofing, Plaintiffs Port 22, Rock Capital, and M&N Trading were deprived of the ability to transact in a lawful market that was free of manipulation and caused Plaintiffs Port 22, Rock Capital, and M&N Trading to receive less to sell 10-Year T-Note Futures contracts.  These artificial prices caused Plaintiffs Port 22, Rock Capital, and M&N Trading to earn less profits or suffer greater losses in their trading of 10-Year T-Note Futures contracts during the Class Period.

### 9.    October 4, 2011 – 10-Year T-Note Futures

108.    On October 4, 2011, JPMorgan Trader C placed an order to buy 100 10-Year T-Note Futures contracts at $130.87500.  Next, Trader C placed a Spoof Order to sell 3,000 10-Year T-Note Futures contracts at $130.890625 intending to create the appearance of supply and artificially move the price lower.  Trader C's Spoof Order artificially created the illusion of supply for 10-Year T-Note Futures, which caused the price of 10-Year T-Note Futures to move artificially lower.  Then, Trader C's entire order to buy was filled.  Having successfully manipulated the price of 10-Year T-Note Futures lower, Trader C cancelled his entire Spoof Order.[48]

---

[47] CFTC Order at Section II.C.3.

[48] DPA at ¶ 88.

109.    On this same day, October 4, 2011, Plaintiff Port 22 sold 1,673 10-Year T-Note Futures contracts, Plaintiff Rock Capital sold 1,324 10-Year T-Note Futures contracts, and Plaintiff M&N Trading sold 6,533 10-Year T-Notes Futures contracts.  As a result of Defendants' spoofing, Plaintiffs Port 22, Rock Capital, and M&N Trading were deprived of the ability to transact in a lawful market that was free of manipulation and caused Plaintiffs Port 22, Rock Capital, and M&N Trading to receive less to sell 10-Year T-Note Futures contracts.  These artificial prices caused Plaintiffs Port 22, Rock Capital, and M&N Trading to earn less profits or suffer greater losses in their trading of 10-Year T-Note Futures contracts during the Class Period.

### 10.    January 25, 2012 – 10-Year T-Note Futures

110.    On January 25, 2012, JPMorgan Trader C placed an order to buy fifty (50) 10-Year T-Note Futures contracts at $130.15625.  Trader C then placed a Spoof Order to sell 4,000 10-Year T-Note Futures contracts at $130.171875 intending to create the appearance of supply and artificially move the price lower.  Trader C's Spoof Order artificially created the illusion of supply for 10-Year T-Note Futures, which caused the price of 10-Year T-Note Futures to move artificially lower.  Shortly after, Trader C's entire order to buy was filled.  Having successfully manipulated the price of 10-Year T-Note Futures lower, Trader C cancelled his entire Spoof Order.[49]

111.    On this same day, January 25, 2012, Plaintiff Kohl Trading sold 132 10-Year T-Note Futures contracts, Plaintiff Port 22 sold 3,437 10-Year T-Note Futures contracts, Plaintiff Rock Capital sold 1,678 10-Year T-Note Futures contracts, and Plaintiff M&N Trading sold 3,851 10-Year T-Notes Futures contracts.  As a result of Defendants' spoofing, Plaintiffs Kohl Trading, Port 22, Rock Capital, and M&N Trading were deprived of the ability to transact in a lawful market that was free of manipulation and caused Plaintiffs Kohl Trading, Port 22, Rock Capital, and M&N Trading to

---

[49] DPA at ¶ 89.

receive less to sell 10-Year T-Note Futures contracts.  These artificial prices caused Plaintiffs Kohl Trading, Port 22, Rock Capital, and M&N Trading to earn less profits or suffer greater losses in their trading of 10-Year T-Note Futures contracts during the Class Period.

### 11.     March 16, 2012 – 5-Year T-Note Futures

112.     On March 16, 2012, JPMorgan Trader D placed an order to sell 100 5-Year T-Note Futures contracts at $121.921875.  Next, Trader D placed a Spoof Order to buy 1,000 5-Year T-Note Futures contracts at $121.9140625 intending to create the appearance of demand and artificially move the price higher.  Trader D's Spoof Order artificially created the illusion of demand for 5-Year T-Note Futures, which caused the price of 5-Year T-Note Futures to move artificially higher.  Trader D's entire order to buy was then filled.  Having successfully manipulated the price of 5-Year T-Note Futures higher, Trader D cancelled his entire Spoof Order.[50]

113.     On this same day, on March 16, 2012, Plaintiff Kohl Trading bought 204 5-Year T-Note Futures contracts, Plaintiff Port 22 bought 569 5-Year T-Note Futures contracts, Plaintiff Rock Capital bought 909 5-Year T-Note Futures contracts, and Plaintiff M&N Trading bought 1,244 5-Year T-Note Futures contracts.  As a result of Defendants' spoofing, Plaintiffs Kohl Trading, Port 22, Rock Capital, and M&N Trading were deprived of the ability to transact in a lawful market that was free of manipulation and caused Plaintiffs Kohl Trading, Port 22, Rock Capital, and M&N Trading to pay more to purchase 5-Year T-Note Futures contracts.  These artificial prices caused Plaintiffs Kohl Trading, Port 22, Rock Capital, and M&N Trading to earn less profits or suffer greater losses in their trading of 5-Year T-Note Futures contracts during the Class Period.

---

[50] DPA at ¶ 92.

### 12.   April 2, 2012 – Ultra T-Bond Futures Contract

114.   On April 2, 2012, Trader B placed an iceberg order to buy twenty-five (25) Ultra T-Bond Futures contracts at $151.46875.  Trader B then placed a Spoof Order to sell 250 Ultra T-Bond Futures contracts at $151.50000 intending to create the appearance of supply and artificially move the price lower.  Trader B's Spoof Order artificially created the illusion of supply for Ultra T-Bond Futures, which artificially moved the price of Ultra T-Bond Futures lower.  Trader B's entire order to buy was then filled.  Having successfully manipulated the price of Ultra T-Bond Futures lower, Trader B cancelled his entire Spoof Order.[51]

115.   On this same day, April 2, 2012, Plaintiff Rock Capital sold sixty-four (64) Ultra T-Bond Futures contracts and Plaintiff M&N Trading sold sixty-four (64) Ultra T-Bond Futures contracts.  As a result of Defendants' spoofing, Plaintiffs Rock Capital and M&N Trading were deprived of the ability to transact in a lawful market that was free of manipulation and caused Plaintiffs Rock Capital and M&N Trading to receive less to sell Ultra T-Bond Futures contracts.  These artificial prices caused Plaintiffs Rock Capital and M&N Trading to earn less profits or suffer greater losses in their trading of Ultra T-Bond Futures contracts during the Class Period.

### 13.   February 13, 2013 – T-Bond Futures Contract

116.   On February 13, 2013, JPMorgan Trader B placed an order to sell thirty (30) T-Bond Futures contracts at $142.90625.  Trader B then modified the order to increase its total quantity to fifty (50) contracts and to make it an iceberg order that displayed thirty (30) of the fifty (50) contracts.  Next, Trader B placed a Spoof Order to buy 1,100 T-Bond Futures contracts at $142.87500 intending to create the appearance of demand and artificially move the price higher.  Trader B's Spoof Order artificially created the illusion of demand for T-Bond Futures, which caused the price of T-Bond

---

[51] DPA at ¶ 85.

Futures to move artificially higher. Next, Trader B's entire order to sell was filled. Having successfully manipulated the price of T-Bond Futures higher, Trader B cancelled his entire Spoof Order.[52]

117.    On this same day, February 13, 2013, Plaintiff Kohl Trading bought five (5) T-Bond Futures contracts, Plaintiff Port 22 bought eighty (80) T-Bond Futures contracts, Plaintiff Rock Capital bought 124 T-Bond Futures contracts, and Plaintiff M&N Trading bought 810 T-Bond Futures contracts. As a result of Defendants' spoofing, Plaintiffs Kohl Trading, Port 22, Rock Capital, and M&N Trading were deprived of the ability to transact in a lawful market that was free of manipulation and caused Plaintiffs Kohl Trading, Port 22, Rock Capital, and M&N Trading to pay more to purchase T-Bond Futures contracts. These artificial prices caused Plaintiffs Kohl Trading, Port 22, Rock Capital, and M&N Trading to earn less profits or suffer greater losses in their trading of T-Bond Futures contracts during the Class Period.

### 14.    June 19, 2013 – T-Bond Futures Contract

118.    On June 19, 2013, Trader A placed an iceberg order to buy 200 T-Bond Futures contracts at $139.53125. Next, Trader A placed a Spoof Order to sell 500 T-Bond Futures contracts at $139.56250 intending to create the appearance of supply and artificially move the price lower. Trader A's Spoof Order artificially created the illusion of supply for T-Bond Futures, which caused the price of T-Bond Futures to move artificially lower. Trader A's order to buy was then filled in its entirety. Having successfully manipulated the price of T-Bond Futures lower, Trader A cancelled his entire Spoof Order.[53]

119.    On this same day, June 19, 2013, Plaintiff Kohl Trading sold ten (10) T-Bond Futures contracts, Plaintiff Port 22 sold 125 T-Bond Futures contracts, Plaintiff Rock Capital sold 168 T-Bond Futures contracts, and Plaintiff M&N Trading sold 348 T-Bond Futures contracts. As a result of

---

[52] DPA at ¶ 86.

[53] DPA at ¶ 81.

Defendants' spoofing, Plaintiffs Kohl Trading, Port 22, Rock Capital, and M&N Trading were deprived of the ability to transact in a lawful market that was free of manipulation and caused Plaintiffs Kohl Trading, Port 22, Rock Capital, and M&N Trading to receive less to sell T-Bond Futures contracts.  These artificial prices caused Plaintiffs Kohl Trading, Port 22, Rock Capital, and M&N Trading to earn less profits or suffer greater losses in their trading of T-Bond Futures contracts during the Class Period.

### 15.    June 30, 2015 – Ultra T-Bond Futures Contract

120.    On June 30, 2015, JPMorgan Trader 10 placed an order to buy 200 lots of the Ultra T-Bond Futures contract with September 2015 expiry at a price of $153.71875.  The order was an iceberg order with one (1) lot visible to the market.  After entering the buy order, Trader 10 entered a Spoof Order for 100 lots on the sell side of the market, at a price of $153.75.  Trader 10's Spoof Order artificially created the illusion of supply for Ultra T-Bond Futures, which caused the price of Ultra T-Bond Futures to move artificially lower.  Next, fifty-one (51) lots of Trader 10's 200-lot order to buy were filled and shortly after, Trader 10 canceled his entire sell-side Spoof Order.  Having successfully manipulated the price of Ultra T-Bond Futures lower, Trader 10 canceled the remaining 149 lots of his order.[54]

121.    On this same day, June 30, 2015, Plaintiff Budo sold 135 Ultra T-Bond Futures contracts and Plaintiff M&N Trading sold 103 Ultra T-Bond Futures contracts.  As a result of Defendants' spoofing, Plaintiffs Budo and M&N Trading were deprived of the ability to transact in a lawful market that was free of manipulation and caused Plaintiffs Budo and M&N Trading to receive less to sell Ultra T-Bond Futures contracts.  These artificial prices caused Plaintiffs Budo and M&N

---

[54] CFTC Order at Section II.C.3.

Trading to earn less profits or suffer greater losses in their trading of Ultra T-Bond Futures contracts during the Class Period.

### 16.    December 3, 2015 – Ultra T-Bond Futures Contract

122.    On December 3, 2015, Trader A placed an iceberg order to buy thirty (30) Ultra T-Bond Futures contracts at $157.09375.  Next, Trader A placed a Spoof Order to sell 100 Ultra T-Bond Futures contracts at $157.12500 intending to create the appearance of supply and artificially move the price lower.  Trader A's Spoof Order artificially created the illusion of supply for Ultra T-Bond Futures, which caused the price of Ultra T-Bond Futures to move artificially lower.  Trader A's order to buy was then filled in its entirety.  Having successfully manipulated the price of Ultra T-Bond Futures lower, Trader A cancelled his entire Spoof Order.[55]

123.    On this same day, December 3, 2015, Plaintiff Budo sold 164 Ultra T-Bond Futures contracts and Plaintiff Port 22 sold twenty (20) Ultra T-Bond Futures.  As a result of Defendants' spoofing, Plaintiffs Budo and Port 22 were deprived of the ability to transact in a lawful market that was free of manipulation and caused Plaintiffs Budo and Port 22 to receive less to sell Ultra T-Bond Futures contracts.  These artificial prices caused Plaintiffs Budo and Port 22 to earn less profits or suffer greater losses in their trading of Ultra T-Bond Futures contracts during the Class Period.

### 17.    January 6, 2016 – T-Bond Futures Contract

124.    On January 6, 2016, Trader A placed an iceberg order to sell 200 T-Bond Futures contracts at $155.31250.  Next, Trader A placed a Spoof Order to buy 200 T-Bond Futures contracts at $155.28125 with the intent to create the illusion of demand and artificially move the market price higher.  Trader A's Spoof Order artificially created the illusion of demand for T-Bond Futures, which caused the price of T-Bond Futures to move artificially higher.  Then, Trader A's order to sell was

---

[55] DPA at ¶ 82.

filled in its entirety.  Having successfully manipulated the price of T-Bond Futures higher, Trader A cancelled his Spoof Order in its entirety.[56]

125.    On this same day, January 6, 2016, Plaintiff Budo purchased 488 T-Bond Futures contracts and Plaintiff Port 22 purchased 141 T-Bond Futures contracts.  As a result of Defendants' spoofing, Plaintiffs Budo and Port 22 were deprived of the ability to transact in a lawful market that was free of manipulation and caused Plaintiffs Budo and Port 22 to pay more to purchase T-Bond Futures contracts.  These artificial prices caused Plaintiffs Budo and Port 22 to earn less profits or suffer greater losses in their trading of T-Bond Futures contracts during the Class Period.

126.    In each of the above representative examples JPMorgan successfully manipulated the Treasury Futures market to illegally increase their trading profits, at the expense of Plaintiffs and the Class.

127.    Defendants manipulated Treasury Futures' prices throughout the Class Period and thereby caused damages to Plaintiffs and Class members who purchased or sold at artificially inflated or deflated prices.

### D.    Defendants Failed to Supervise its U.S. Treasuries Desk

128.    JPMorgan's compliance functions failed to detect JPMorgan's traders' manipulative trading throughout the Class Period, despite JPMorgan's policies and procedures prohibiting spoofing, layering, and other manipulative trading practices.  JPMorgan's FCM Compliance Manual prohibited FCM personnel from engaging in disruptive trading practices including spoofing, forbade them from engaging in manipulative activity, and required them to report internally any suspected or known fraudulent activity or market manipulation.[57]

---

[56] DPA at ¶ 83.

[57] *See* CFTC Order at Section II.C.4.

129. JPMorgan also was required to conduct surveillance in order to identify potential market manipulation or other impermissible trading activity.[58]

130. The SEC Order notes that JPMorgan issued compliance bulletins in July 2013 and December 2015 "regarding spoofing, layering, and other manipulative trading practices" including "specifically prohibit[ing] the manipulative trading techniques described" in the SEC's Order.[59]

131. Prior to 2014, JPMorgan's surveillance system lacked the ability to effectively identify spoofing conduct. Despite implementing a newer surveillance tool starting in 2014, and despite numerous red flags, including internal surveillance alerts, inquiries from CME and the Commission, and internal allegations of misconduct from a JPMorgan trader, JPMorgan still failed to provide supervision to its employees sufficient to enable JPMorgan to identify, adequately investigate, and put a stop to the Treasuries Desk's misconduct.[60] Accordingly, JPMorgan failed to perform its supervisory duties diligently.

## CLASS ACTION ALLEGATIONS

132. Plaintiffs brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all others similarly situated. The "Class" is defined as:

> All persons or entities who transacted in Treasury Futures or options on Treasury Futures traded on the Chicago Board of Trade from April 1, 2008 through January 31, 2016 (the "Class Period").

133. Specifically excluded from the Class are Defendants and their co-conspirators; the officers, directors, or employees of any Defendant or co-conspirator; any entity in which any Defendant or co-conspirator has a controlling interest; and any affiliate, legal representative, heir, or assign of any Defendant or co-conspirator and any person acting on their behalf. Also excluded from

---

[58] *See* CFTC Order at Section II.C.4.

[59] SEC Order at ¶ 11.

[60] CFTC Order at Section II.C.4.

the Class are the United States Government, any judicial officer presiding over this action and the members of their immediate family and judicial staff, and any juror assigned to this action.

134.    The Class members are so numerous and geographically dispersed that joinder of all members is impracticable.  There are at least hundreds of individuals or entities that purchased, sold, or held relevant Treasury Futures and options on Treasury Futures during the Class Period at prices artificially impacted by Defendants' wrongful conduct.  While the exact number and identity of Class members is unknown to Plaintiffs, this can be ascertained from readily available information.

135.    Plaintiffs' claims are typical of the claims of other Class members.  Plaintiffs and the members of the Class sustained damages arising out of Defendants' common course of conduct in the violations of law as complained of herein.  The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of the laws as alleged herein.  No conflict between Plaintiffs and the Class members exists.

136.    Plaintiffs will fairly and adequately protect the Class's interests.  Plaintiffs are represented by sophisticated, competent class action counsel, experienced in litigating complex class action litigation involving claims arising under the CEA.  Defendants have acted in an unlawful manner on grounds generally applicable to all Class members.

137.    The questions of law or of fact common to the claims of the Class predominate over any questions affecting only individual Class members, including legal and factual issues relating to liability and damages, such that certifying this case as a class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Questions of law and fact common to all Class members, include, but are not limited to:

    a.    whether Defendants fixed, lowered, maintained, stabilized, and/or otherwise manipulated Treasury Futures prices;

    b.    the nature and duration of Defendants' manipulation of Treasury Futures prices;

    c.       whether Defendants' conduct violated Section 22 of the CEA;

    d.       whether Defendants fraudulently concealed their misconduct from Plaintiffs and the Class; and

    e.       the appropriate class-wide measure of relief for Defendants' CEA violations.

138.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

139.    The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

140.    Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

### EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

141.    During the Class Period, Defendants actively, fraudulently, and effectively concealed their collusion and manipulation of the Treasury Futures market.

142.    Defendants concealed their manipulative acts by, *inter alia*, placing orders to buy or sell Treasury Futures at a certain price, even though they secretly had no intent of transacting at that level. Never did Defendants disclose that they placed these orders to manipulate the prices of those instruments. Because of such fraudulent concealment, and the fact that Defendants' manipulation is

inherently self-concealing, Plaintiffs and the Class could not have discovered Defendants' manipulation any earlier than the date of the public disclosures thereof.

143.     As a result, Plaintiffs and the Class had no knowledge of Defendants' unlawful and self-concealing manipulative acts and could not have discovered the same by the exercise of due diligence on or before February 25, 2020, when Defendants announced in their 2019 Form 10-K filing with the SEC that they had received a request from regulators regarding their practices in the Treasury Futures market.

144.     As a result of the concealment of Defendants' unlawful conduct, and the self-concealing nature of Defendants' manipulative acts, Plaintiffs assert the tolling of the applicable statute of limitations affecting the rights of the causes of action asserted by Plaintiffs and the Class.

145.     Defendants are equitably estopped from asserting that any otherwise applicable limitations period has run.

### FIRST CLAIM FOR RELIEF
**Manipulation of Treasury Futures**
**in Violation of the Commodity Exchange Act**
**(7 U.S.C. § 1, *et seq.* and Regulation 180.2)**
**(Against All Defendants)**

146.     Plaintiffs incorporate the Complaint's allegations by reference and reallege them as though fully set forth herein.

147.     During the Class Period Defendants intended to and did cause unlawful and artificial prices of Treasury Futures in violation of the CEA, 7 U.S.C. § 1, *et seq.*, through their use of manipulative buy and sell orders and other manipulative conduct.

148.     Defendants manipulated the price of a commodity in interstate commerce and/or for future delivery on or subject to the rules of a registered entity, in violation of the CEA.

149.     During the Class Period, Treasury Futures' prices did not result from legitimate market information and the forces of supply and demand.  Instead, Treasury Futures' prices were artificially inflated, or deflated, by Defendants' spoofing and other manipulative trading activities.

150.     Throughout the Class Period, Defendants entered large orders to buy or sell without the intention of having those orders filled and specifically intending to cancel those orders prior to execution.  Defendants intended to inject false information about supply and demand into the marketplace and to artificially move prices up or down to suit Defendants' own trades and positions. As a result of these artificial prices, Plaintiffs and the Class suffered losses on their trades in Treasury Futures.

151.     Defendants manipulated Treasury Futures' prices throughout the Class Period and thereby caused damages to Plaintiffs and Class members who purchased or sold at artificially inflated or deflated prices.

152.     Defendants had the ability to cause and did cause artificial prices of Treasury Futures. Defendants, either directly and/or through their employees and/or affiliates, were active in the markets for Treasury Futures and were aware of the effects of spoofing and other manipulative trading activities on those markets.

153.     By their intentional misconduct, Defendants each violated Sections 6(c), 6(d), 9(a), and 22(a) of the CEA, 7 U.S.C. §§ 9, 13b, 13(a), and 25(a), throughout the Class Period.

154.     As a result of Defendants' unlawful conduct, Plaintiffs and the Class have suffered damages and injury-in-fact due to artificial prices for Treasury Futures, to which Plaintiffs and the Class would not have been subject but for Defendants' unlawful conduct.

155.     Plaintiffs and the Class are each entitled to actual damages sustained in Treasury Futures for the CEA violations alleged herein.

## SECOND CLAIM FOR RELIEF
### For Employing a Manipulative and Deceptive Device In
### Violation of The Commodity Exchange Act, As Amended
### (7 U.S.C. §§ 1, *et seq.* and Rule 180.1(a))
### (Against All Defendants)

156.     Plaintiffs incorporate the Complaint's allegations by reference and reallege them as though fully set forth herein.

157.     Defendants' unlawful conduct, including the use of submitting and cancelling spoof orders and engaging in other manipulative conduct in order to artificially move prices for Treasury Futures, constitutes the employment of a manipulative and deceptive device.

158.     Defendants acted intentionally – and, even if they are found to not have acted intentionally, then at least acted recklessly – in employing the manipulative and deceptive device to procure ill-gotten trading profits at the expense of Plaintiffs and the Class.  The risk that Defendants' spoof orders and other manipulative trading activities could mislead other market participants into believing there was genuine interest in purchasing or selling the specified number of contracts represented by Defendants' spoof orders and other manipulative trading activities were so obvious that Defendants must have been aware of it.

159.     Defendants knew that their spoof orders would appear in the order book and that traders often consider order book information in making trading decisions; thus, Defendants were, at least, reckless with respect to the danger that their spoof orders would mislead other market participants.

160.     Through their intentional misconduct, Defendants each violated Sections 6(c) and 22(a) of the CEA, 7 U.S.C. §§ 9 and 25(a), throughout the Class Period.

161.     As a result of Defendants' unlawful conduct, Plaintiffs and the Class have suffered damages and injury-in-fact due to artificial prices for Treasury Futures contracts and options on those

futures contracts, to which Plaintiffs and the Class would not have been subject but for Defendants' unlawful conduct.

162.    Plaintiffs and the Class are each entitled to damages for the CEA violations alleged herein.

**THIRD CLAIM FOR RELIEF**
**Vicarious Liability in Violation of the**
**Commodity Exchange Act, As Amended**
**(7 U.S.C. §§ 1, *et seq.*)**
**(Against All Defendants)**

163.    Plaintiffs incorporate the Complaint's allegations by reference and reallege them as though fully set forth herein.

164.    Each Defendant is liable under Section 2(a)(1) of the CEA, 7 U.S.C. § 2(a)(1), for the manipulative acts of their agents, representatives, and/or other persons acting for them in the scope of their employment.

165.    Plaintiffs and the Class are each entitled to damages for the CEA violations alleged herein.

**FOURTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**(Against All Defendants)**

166.    Plaintiffs incorporate the Complaint's allegations by reference and reallege them as though fully set forth herein.

167.    Defendants financially benefited from their unlawful acts.   As alleged herein, Defendants submitted spoof orders to the CME and employed other techniques to manipulate the prices of Treasury Futures in an artificial direction.  Defendants intended to, and did, artificially alter prices in a direction that benefitted their trades and positions, at Plaintiffs' and the Class' expense.

168.     It would be inequitable for Defendants to be allowed to retain the benefits which Defendants obtained from their illegal manipulative acts and other unlawful conduct at Plaintiffs' and the Class' expense.

169.     Plaintiffs and the Class are entitled to the establishment of a constructive trust impressed upon the benefits to Defendants from their unjust enrichment and inequitable conduct.

170.     In addition, each Defendant should pay restitution for its own unjust enrichment to Plaintiffs and the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

(A)     For an order certifying this lawsuit as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure and designating Plaintiffs as the Class representatives and Kirby McInerney LLP and Lowey Dannenberg, P.C. as Class Counsel;

(B)     For a judgment awarding Plaintiffs and the Class actual and punitive damages for Defendants' CEA violations, together with pre- and post-judgment interest at the maximum rate allowable by law;

(C)     For a constructive trust and disgorgement of ill-gotten profits flowing from Defendants' manipulative conduct;

(D)     For an award to Plaintiffs and the Class of their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

(E)     For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues.

Dated: April 2, 2021

**KIRBY McINERNEY LLP**                    **LOWEY DANNENBERG, P.C.**

*/s/ Karen M. Lerner*                         */s/ Vincent Briganti*
Karen M. Lerner                              Vincent Briganti
David E. Kovel                               Raymond P. Girnys

48

Anthony E. Maneiro
250 Park Avenue, Suite 820
New York, NY 10177
Tel.: (212) 371-6600
Email: klerner@kmllp.com
dkovel@kmllp.com
amaneiro@kmllp.com

Johnathan P. Seredynski
44 South Broadway, Suite 1100
White Plains, NY 10601
Tel.: (914) 997-0500
Email: vbriganti@lowey.com
rgirnys@lowey.com
jseredynski@lowey.com

*Interim Co-Lead Counsel for Plaintiffs and the Proposed Class*

**CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP**

Anthony F. Fata (*pro hac vice*)
Jennifer W. Sprengel (*pro hac vice* forthcoming)
Christopher P.T. Tourek
Brian P. O'Connell (*pro hac vice* forthcoming)
150 S. Wacker, Suite 3000
Chicago, IL 60606
Tel.: (312) 782-4882
E-mail: afata@caffertyclobes.com
jsprengel@caffertyclobes.com
ctourek@caffertyclobes.com
boconnell@caffertyclobes.com

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

Christopher M. Burke
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel.: (619) 233-4565
E-mail: cburke@scott-scott.com

Amanda F. Lawrence
156 South Main Street
P.O. Box 192
Colchester, CT 06415
Telephone: (860) 531-2645
Email: alawrence@scott-scott.com

Louis F. Burke
Thomas K. Boardman
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-4478
Email: lburke@scott-scott.com
tboardman@scott-scott.com

**FREED KANNER LONDON & MILLEN LLC**

Steven A. Kanner (*pro hac vice*)
Douglas A. Millen
Brian M. Hogan (*pro hac vice*)
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone: 224-632-4500
E-mail: skanner@fklmlaw.com
dmillen@fklmlaw.com
bhogan@fklmlaw.com

*Additional Counsel for Plaintiffs and the Proposed Class*